**NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE et al., Plaintiffs,**

v.

**The WILMINGTON MEDICAL CENTER, INC., et al., Defendants.**

Civ. A. No. 76–298.

United States District Court, Delaware.

April 7, 1978.

See also, D.C., 436 F.Supp. 1194; 453 F.Supp. 330.

Douglas A. Shachtman, Community Legal Aid Society, Inc., Wilmington, Del. and

Marilyn G. Rose, Christine B. Hickman and Herbert Semmel, Center for Law and Social Policy, Washington, D. C., and Louise Lander, New York City, for plaintiffs.

Jeffrey M. Goddess, City Sol., Charles H. Toliver IV, and Alan Bernard Scher, Asst. City Sol., Wilmington, Del., for plaintiff intervenor, City of Wilmington.

Rodney M. Layton, Wendell Fenton and William J. Wade, of Richards, Layton & Finger, Wilmington, Del., for defendants The Wilmington Medical Center, Inc., Crawford H. Greenewalt and Joseph A. Dallas.

James W. Garvin, Jr., U. S. Atty., Wilmington, Del., Barbara A. Babcock, Asst. Atty. Gen., Barbara B. O'Malley, Ann F. Cohen and Rebecca L. Ross, Trial Attys., Dept. of Justice, Washington, D. C., Stephanie W. Naidoff, Regional Atty., William Reinhart, Asst. Regional Atty., Philadelphia, Pa., and Jeffrey Champagne, Atty., Dept. of Health, Education and Welfare, Washington, D. C., for defendant Secretary of Health, Education and Welfare.

Edward F. Kafader, Asst. Atty. Gen., Dept. of Justice, Dover, Del., for defendant Amos Burke, Director of the Bureau of Comprehensive Health Planning.

William C. Gordon, pro se.

OPINION

LATCHUM, Chief Judge.

■ The controversy in this case arises over the decision of the defendant Wilmington Medical Center to relocate the major tertiary care components of its existing inner-city hospital system to an outlying suburban location. The plaintiffs,[1] five organizations and six individuals representing minority and handicapped persons residing primarily in the City of Wilmington,[2] brought this suit in September, 1976, charging that the proposed relocation discriminates against them in violation of their rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). Essentially, they contend the plan to relocate hospital services to the suburban location will cause disparities in the availability and quality of medical care for the urban community—a result that will impact disproportionately upon the poor, the elderly, ethnic and racial minorities, and the handicapped. Their complaint seeks, *inter alia,* a judgment (1) that declares the proposed relocation to be in violation of the above statutes and (2) that enjoins commencement of its construction phase pending the outcome of a civil rights "compliance review" of the proposal by the federal defendant.[3] Subject matter jurisdiction is principally based upon 28 U.S.C. § 1331 (federal questions),[4] 28 U.S.C. § 1343 (civil rights), and 28 U.S.C. § 1361 (mandamus against federal officials). In addition to the Wilmington Medical Center ("WMC"), the named defendants are the Secretary of the United States Department of Health, Education

1. The Court granted class action certification pursuant to Rule 23(b)(2), F.R.Civ.P., and the class was designated as follows:

"1. All black and Puerto Rican residents of Wilmington and other areas of New Castle County who are better served by the existing locations of the Wilmington Medical Center, Incorporated ("Medical Center");

2. All handicapped residents of Wilmington and other areas of New Castle County who are better served by the existing locations of the Medical Center." (Docket Item 30 at 2).

2. The City of Wilmington has been permitted to intervene as a party plaintiff. (Docket Item 11).

3. The rights asserted by the plaintiffs arguably fall within the zone of interests to be protected by the statutes in question; if entitled either to be free of discrimination under a federally-assisted activity or simply to have equal access to the services and benefits provided by such an activity, they have alleged sufficient injury or harm in fact to satisfy the concept of standing. *United States v. SCRAP,* 412 U.S. 669, 683–90, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 152–56, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

4. The complaint contains a facially sufficient claim that the value of the rights asserted by each plaintiff exceeds $10,000 exclusive of interest and costs.

and Welfare (the "Secretary" or "HEW"), the Director of the Delaware Bureau of Comprehensive Health Planning ("BCHP"), and the Chairman of the Health Planning Council, Inc. of New Castle County ("HPC").

The case is presently before the Court on cross-motions for partial summary judgment filed by the plaintiffs and the Secretary[5] and upon a motion for summary judgment filed by the defendant WMC.[6] In essence, these motions[7] call for judicial review of an informal determination[8] by the Secretary that WMC's proposed hospital relocation, after substantial modification in accordance with various "assurances" given by WMC, will not contravene the policies intended to be effectuated by Title VI and Section 504. Moreover, assuming the matter is resolved in favor of the Secretary, the merits of the plaintiffs' claim against WMC will be necessarily settled in like manner and final judgment accordingly entered thereon. Because there are no issues of fact material to the resolution of this matter in dispute and because the matter is now ripe for judicial review, summary judgment is appropriate. Rule 56, F.R.Civ.P.

## I. BACKGROUND

A description of the factual background of this hardfought and complicated law suit is essential to a full understanding of the issues and of the contending parties' claims.

### A. *WMC and the Evolution of Plan Omega*

Defendant WMC, a privately owned, nonprofit general hospital organized and incorporated under the laws of the State of Delaware, was formed in 1965 as a result of "the first full corporate merger between three voluntary, nonsectarian, acute care general hospitals in the United States. These long-established institutions are now divisions of [WMC] and include the Delaware Hospital, the Wilmington Memorial Hospital and its rehabilitation facility, the Eugene duPont Memorial Hospital, and the Wilmington General Hospital."[9] As a multi-unit hospital system, WMC is in the enviable position of being the principal health care resource for the State of Delaware and especially for the city of Wilmington and the surrounding metropolitan area. Of the eight general hospitals in the state, four are controlled by WMC; its three major divisions, moreover, operate about 1,100 beds or nearly 75 percent of the available acute care beds in the city and New Castle County.[10] Besides its uniqueness as a statewide hospital system, WMC is one of a handful of urban medical centers that has developed

5. Docket Items 199 & 201. Plaintiffs' motion is styled as one for summary judgment, but is actually one for "partial" summary judgment. *See* Plaintiffs' Memorandum of Points and Authorities, Docket Item 217, at n. 4.

6. Docket Item 200.

7. Two other motions are also before the Court: (1) WMC's motion, joined in by the Secretary, to strike certain exhibits and deposition testimony submitted by plaintiffs in support of their motion for partial summary judgment (Docket Items 223 & 226 at 3), (2) plaintiffs' motion to modify an earlier order of the Court establishing the standard of review to be applied in this case (Docket Item 198). For the reasons discussed below, the motion to strike filed by WMC and the Secretary will be granted and the plaintiffs' motion to modify the pre-trial order will be denied.

8. By "informal determination" the Court refers to administrative action taken without a formal hearing and not subject to the public participa-

tion provision of § 4(c) of the Administrative Procedure Act, 5 U.S.C. § 553(c).

9. M. Brown & H. Lewis, Hospital Management Systems 51 (1976), (hereinafter "Brown & Lewis"), Administrative Record ("Ad.Rec.") Ex. SM-19; Ad.Rec. Ex. C-33 at C-258. The three major divisions of WMC are located reasonably close to each other within the center of the city of Wilmington, while the smaller rehabilitation facility is located about two and one-half miles away on the western perimeter of the city. Docket Item 53A, Ex. 1.

10. Docket Item 53A, Ex. 2. The eight general hospitals in the State together operate close to 2,300 beds. There are roughly 1500 available nonprofit, acute care hospital beds in New Castle County. Within the city, the Delaware Division contains 542 beds, the General Division has 280, and the Memorial Division has 282. Two smaller acute-care facilities in the city, Riverside and St. Francis Hospital, together operate roughly 400 beds. *Id.*

in the context of a manpower production center, surrounded by the vast chemical complexes and related industries and research facilities established in the Wilmington area. Finally, the geographic compactness of the State and the proximity of a major university and nearby medical schools have also contributed to WMC's unique position.[11]

Nevertheless, a variety of factors—not the least of which are the "growth pains" present in any new organization—have combined to alter WMC's unique situation. For example, during the past ten years New Castle County, similar to other metropolitan areas, has witnessed a population exodus from the city to the suburbs. Wilmington's population approaches 80,000, but 15,000 more persons left than entered the city between the 1960 and 1970 censuses, while the suburban areas to the south and west of the city increased by 10,000 during the same time period. And the trend in the population shift evidently continues unabated. In pointing out a further problem encountered by the managers of WMC, a commentator has observed:

"Many multiple-unit [hospital] systems have developed in a unit of service con-

figuration like a doughnut with the acute care tertiary care center occupying the hole of the doughnut and satellite or branch facilities located on the periphery. WMC hospitals are all within the hole of the doughnut . . . ."[12]

For more than a decade WMC engaged in an extensive planning process intended to develop the most feasible method to improve the efficiency and quality of its delivered health care and to respond to the growing need for a hospital facility in the southwestern region of New Castle County. In October, 1975, WMC's Board of Directors unanimously adopted a proposal, commonly known as Plan Omega, that envisioned a major realignment of the health resources presently available at its three major inner-city divisions.[13] Under this plan numerous nonemergency inpatient and outpatient services offered by the three Wilmington divisions will be transferred to a major 800-bed tertiary care facility to be constructed on a 200-acre site located about eight miles southwest of the city in Stanton, Delaware (the "Southwest" or "Stanton" Division).[14] Although the General and Memorial Divisions will be closed, a re-

---

11. Delaware does not have a medical school. However, by virtue of an affiliation agreement between WMC, the University of Delaware and the Jefferson Medical College of Thomas Jefferson University in Philadelphia, 20 premedical students are admitted annually to Jefferson and receive their two years of clinical education at WMC. Docket Item 20A, Ex. 7.

12. Brown & Lewis at 54.

13. The Eugene duPont Memorial Hospital is not involved in the project and will remain unchanged. Docket Item 53A, Ex. 2.

The managers of WMC have stated that its long-range planning effort resulted from a consideration of four basic factors: (1) the deteriorating condition of its existing facilities, all of

which fall below required accreditation standards, (2) economies of scale and quality that would result from consolidating medical-dental services under "one roof," (3) the shift of the population center to the southern region of the county and the convenient location of hospital facilities serving that patient population, and (4) financial considerations. *See, e. g.,* Ad.Rec. Ex. SM–4 at SM–1015, Ex. C–49 at C–734; Report of Investigation of WMC's Plan Omega As A Title VI And Section 504 Complaint at 227 (hereinafter "Investigative Report").

14. The contract of assurances identifies the location of inpatient services under Plan Omega as follows:

| Department | Section | Location |
|---|---|---|
| Medical: | Allergy | Both Divisions |
| | Cardiology | Both " |
| | Dermatology | Both " |
| | Endocrinology | Both " |
| | Gastroenterology | Southwest Division |
| | Internal Medicine | Both " |
| | Nephrology | Southwest Division |
| | Rheumatology | Both " |
| | Physical Medicine | Both " |

stored and modernized Delaware Division will remain as WMC's only sophisticated health care resource in the city. The Delaware Division will continue to offer sophisticated ambulatory and emergency services in addition to regular hospital services, although the plan calls for it to be reduced in size from 542 to 250 beds. The estimated total cost of the project, about 88 million dollars, will be financed primarily with funds generated through charitable contributions and the marketing of tax exempt revenue bonds.[15]

In 1975, nearly 35 percent of WMC's operating revenues (20 million dollars) were derived from federal funds through medicare, medicaid and other federal health assistance reimbursement programs.[16] Moreover, because a hospital's patient fee structure includes a capital component designed to recapture a portion of every dollar spent on capital improvements, continued reimbursement under these federal programs will assure that a respectable part of Plan Omega's construction costs will be furnished by federal sources. According to the plaintiffs' calculations, for example, construction costs related to Plan Omega, which will not be fully depreciated for perhaps thirty years, will be recovered at the

| Department | Medical: Section | Location |
|---|---|---|
| | Chest Diseases | Both " |
| | Infectious Disease | Both " |
| | Hematology | Both " |
| | Neurology | Southwest Division |
| | Oncology | Southwest Division |
| Psychiatry | | Delaware Division |
| Radiation Therapy | | Southwest " |
| Family Practice | | Delaware " |
| Surgical: . | General | Both Divisions |
| | Neurosurgery | Southwest Division |
| | Orthopedic Surgery | Southwest " |
| | Plastic | Southwest " |
| | Proctology | Both Divisions |
| | Thoracic | Southwest Division |
| | Otology | Both Divisions |
| | Rhinolaryngology | Delaware Division |
| | Vascular | Both Divisions |
| Dentistry | | Delaware Division |
| Ophthalmology | | Delaware " |
| Urology | | Southwest " |
| Obstetrics/ Gynecology: | Obstetrics | Southwest Division |
| | Gynecology | Southwest " |
| Pediatrics: | Pediatrics | Southwest Division |
| | Newborn | Southwest " |
| | Premature | Southwest " |

Of the 49 out-patient clinical services offered by WMC, 41 will be located at the Delaware Division and eight will be located at the Southwest Division. Investigative Report at 37, 62, 80–81. There are approximately 40 ancillary or support services (e. g., laboratory and X-ray services) offered by WMC, of which ten will be located exclusively at the Southwest Division, five located exclusively at the Delaware Division, and 25 located at both divisions. *Id.* at 115. Emergency rooms will be maintained at both locations. *Id.* at 116.

**15.** Docket Item 53A, Ex. 2 & 7; Ad.Rec. Ex. C–2 at C–9 to 10, Ex. SM–4 at SM–1015.

**16.** Docket Item 53A, Ex. 7; Docket Item 20, Ex. S–16; Docket Items 1 & 5, par. 5. Commercial insurers and self-paying patients provide the bulk of WMC's operating revenues; miscellaneous sources include cafeteria sales, rental

rate of three million dollars annually through hospital charges paid to WMC by the government under medicare.[17]

B. *Section 1122 of the Social Security Act*

An integral step along the path leading to Plan Omega's realization was taken in early March, 1976, when WMC submitted the plan to defendant BCHP for review under section 1122 of the Social Security Act, 42 U.S.C. § 1320a–1 ("section 1122").[18] That section was enacted by Congress to assure that funds provided under medicare,[19] medicaid[20] and programs for maternal and child health services[21] (collectively, "medicare") are not used to support unnecessary capital expenditures by or on behalf of health care facilities reimbursed under such programs.[22]

Since medicare programs pay a hospital's "reasonable costs," including depreciation on buildings and equipment, debt service and other capital-related costs reasonably apportioned to a hospital's fee structure, WMC sought section 1122 certification to assure that it would not be denied such compensation on the ground that its capital expenditure program (Plan Omega) was "unreasonable."

Under section 1122, Congress authorized the Secretary to negotiate with the gover-

nors of the various states agreements by which a designated state planning agency would be appointed to review the need for a hospital's proposed capital expenditure and to determine whether the proposal is consistent with various state health care standards and criteria.[23]

As a participating state, Delaware, or rather its designated planning agency, defendant BCHP, contracted with an areawide planning group, defendant HPC, to conduct studies and submit comments on section 1122 applications.[24] The areawide planning group is responsible for evaluating a proposed capital expenditure and determining, for example, whether the project can be adequately staffed and operated, whether it is economically feasible, whether it will result in an unreasonable increase in the fee structure of the hospital, and whether the health care needs of the community necessitate such a project.[25] If the hospital and the designated state planning agency adhere to the procedures set forth in section 1122 and the Secretary's regulations,[26] and if the capital expenditure proposal is found to be consistent with the state health care standards and criteria,[27] then the Secretary will not disallow that portion of the medicare bills submitted by

income and grants for specific hospital programs. Docket Item 53A, Ex. 2.

17. Docket Item 53, par. C–13.

18. Indeed, the record supports the conclusion that Plan Omega would not have been undertaken had approval under section 1122 not been secured. *E. g.,* Docket Item 72 at 69.

19. 42 U.S.C. § 1395.

20. 42 U.S.C. § 1396.

21. 42 U.S.C. § 701 *et seq.*

22. Section 1122(a). Recognizing the connection between sound health facility planning and the prudent use of capital funds, Congress enacted section 1122 in order to

"assure that medicare, medicaid, and the maternal and child health programs are consistent with State and local health facility planning efforts, in order to avoid paying higher costs unnecessarily in the future where these costs result from duplication or irrational growth of health care facilities." 1972 U.S. Code Cong. & Admin.News p. 5065.

23. Section 1122(b); *see* 42 C.F.R. § 100.104. The decision whether to participate in the section 1122 program lies with the particular state and it retains the discretion to terminate any agreement entered into. Section 1122(b).

The procedures governing the state agency's evaluation of proposed expenditures are to conform with section 1122 and the regulations promulgated by the Secretary. 42 C.F.R. § 100.106.

24. *See* 42 C.F.R. § 100.105.

25. *Id.* at § 100.197. *See also* Docket Item 39B, Ex. 9.

26. 42 C.F.R. Part 100.

27. If the state agency disapproves the expenditure, appeal may be taken by the applicant to the Secretary; the Secretary's determination, however, is administratively final and judicially unreviewable. Section 1122.

the hospital that represents a return of capital costs by depreciation or otherwise.

In this case, defendant HPC adopted a resolution on June 3, 1976 commenting favorably on Plan Omega[28] and defendant BCHP's approval was registered on June 15, 1976.[29] Having received complete approval at the state level, Plan Omega was submitted to the Secretary who is required under the statute to assure that the proper procedure was followed.[30] On August 6, 1976, the Secretary granted section 1122 approval to Plan Omega.[31] WMC was then assured that that portion of its patient fee structure allocable to a return of depreciation, debt service and other capital costs directly related to Plan Omega would be eligible for reimbursement by way of medicare payments. It is noteworthy, however, that if WMC had abjured the section 1122 process, or been denied approval, it nonetheless could proceed to implement Plan Omega, albeit with the risk that the Secretary might later withhold medicare payments allocable to its capital-related costs.[32]

## C. The Complaint Under Title VI and Section 504

Shortly after Plan Omega was approved by the Secretary, but before WMC had issued its construction bonds, the plaintiffs commenced this action, alleging that the effectuation of Plan Omega will result in a segregated, dual hospital system, in violation of their rights under Title VI and Section 504.[33] Specifically, the plaintiffs asserted that WMC's remaining urban facility, the Delaware Division, will become a "ghetto" hospital serving primarily the poor, the elderly, the handicapped, blacks, and Puerto Ricans, while the proposed Stanton Division will attract the more affluent, white population of suburban New Castle County.[34] They also maintained that the relocation of certain acute care services exclusively at the Stanton hospital will make them virtually inaccessible to many handicapped and minority residents of Wilmington and northern New Castle County and will exacerbate the segregatory effect

28. Ad.Rec. Ex. SM–4 at SM–998 to 1001. The HPC had held public hearings during the course of its review on May 3, 4 and 5, 1976.

29. Docket Item 23, Trivits Affidavit; Docket Item 66A, Exs. 3 & 4.

30. Section 1122(d). The Secretary's role at this point is purely ministerial: if he finds that (1) neither the designated planning agency nor the areawide planning group were given notice by the hospital of its proposed capital expenditure "at least 60 days prior to obligation for such expenditure," section 1122(d)(1)(A), or (2) the designated planning agency had notified the hospital that its capital expenditure proposal was not consistent with the criteria and standards developed by the agency or the State, then the Secretary is *required* to reduce the hospital's medicare payments by the "amount which is attributable to depreciation, interest on borrowed funds, . . . or other expenses related to such capital expenditure." Section 1122(d)(1)(B).

Section 1122(d)(2), however, authorizes the Secretary to allow full or partial federal reimbursement even though the local agency has rejected the hospital's application, if, after review by an advisory council, the Secretary finds that reducing or withholding reimbursement "would discourage the operation or expansion of [a hospital] which has demonstrated to his satisfaction proof of capability to provide comprehensive health care services . . . efficiently, effectively, and economically, . . ." This source of potential discretionary authority is not implicated here because Plan Omega was approved by the local planning agencies.

31. Docket Item 23 (Trivits Affidavit).

32. Conversely, section 1122 certification is not a guarantee that a hospital will receive medicare funds. Rather, it "merely eliminates one possible ground for the reduction, but not the elimination, of medicare payments." *NAACP v. Wilmington Medical Center, Inc.,* 436 F.Supp. 1194, 1198 n.13 (D.Del.1977).

33. The pendency of this action functions as a de facto injunction, thwarting WMC's efforts to market its bonds and to commence construction.

34. Docket Item 52, First Amended Complaint par. 22. Plaintiffs also alleged that the residual Delaware Division facility will be staffed primarily by interns and residents, while the proposed Stanton Division will be staffed principally with board certified specialists. *Id.* par. 23. Thus, plaintiffs basically maintain that those persons who use the residual Wilmington facility will be provided hospital services qualitatively different from the services provided to others using the Stanton hospital.

of a dual hospital system.[35] WMC was therefore charged with violating Title VI and Section 504 because it chose a relocation site under Plan Omega that will have an adverse and disproportionate impact upon minority and handicapped persons residing primarily in the city.[36] The other defendants, the Secretary, BCHP, and HPC, were accused of violating their duties under these statutes because they officially sanctioned under section 1122 a federally assisted hospital relocation project that will have the effect of excluding from participation, denying benefits to, and discriminating against persons on the ground of race, color, national origin or handicap.[37]

D. *The Agency Investigation of Plan Omega*

Initially, the Secretary and the BCHP moved to dismiss the complaint in this case, arguing that because the plaintiffs had not filed an administrative complaint alleging a Title VI violation, as required by the Secre-tary's implementing regulations,[38] the plaintiffs had failed to exhaust their administrative remedies. This argument was rejected, however, and the Court directed the Secretary to address the allegations of the complaint at hand as if it had been filed administratively and to determine whether Plan Omega, if implemented, will violate Title VI or Section 504.[39]

The decision to instruct the Secretary to develop the factual record on plaintiffs' complaint and to exercise his discretion in reviewing Plan Omega, reflected the Court's view that such a process would "carry out the Congressional expectation that Title VI be administered by the appropriate agency and that judicial review of the agency's decision follow traditional paths."[40] Balanced against the desire to invoke the review procedure provided in the Secretary's regulations, however, was the obvious need for an expeditious resolution of the question whether Plan Omega would have a discriminatory impact.[41] The Secre-

---

35. *Id.* par. 21.

36. *Id.* par. 29.

37. *Id.* pars. 23–26, 28, 30–31. The plaintiffs also claimed that the Secretary had failed to file a detailed statement on the environmental impact of WMC's proposed hospital relocation as allegedly required by the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.* In an earlier opinion, however, the Court granted summary judgment in favor of the Secretary on the NEPA claim, holding that the Secretary's limited role in the implementation of Plan Omega under the provisions of section 1122 does not constitute "major Federal action" necessitating preparation of an environmental impact statement. *NAACP v. Wilmington Medical Center, Inc.,* 436 F.Supp. 1194 (D.Del.1977). That ruling is presently on appeal to the Third Circuit Court of Appeals.

38. 45 C.F.R. § 80.7(b). Regulations for effectuating the rights guaranteed by Section 504 became effective June 3, 1977. 42 Fed.Reg. 22675 (May 4, 1977) (45 C.F.R. Part 84). In § 84.61 of those regulations the Secretary adopted the Title VI complaint and enforcement procedures for use in implementing Section 504. *See* 42 Fed.Reg. 22695–702.

39. *NAACP v. Wilmington Medical Center, Inc.,* 426 F.Supp. 919, 924 (D.Del.1977). The Court recognized the general rule that "the failure to seek administrative redress of Title VI and

[Section] 504 grievances would require dismissal of a suit brought under Title VI and [Section] 504 in a federal court." *Id.* (citations omitted). The Secretary's regulations, however, call for a Title VI investigation "whenever a compliance review, report, complaint, or *any other information* indicates a possible failure to comply with [the Secretary's Title VI regulations]." 45 C.F.R. § 80.7(c) (emphasis added). Manifestly, when the complaint filed in this case was served upon the Secretary he received sufficient "information" to initiate a Title VI investigation.

The Court also rejected plaintiffs' request that the exhaustion requirement be waived in this particular proceeding based on their contention that efforts to seek administrative review of their claim would have been futile because of the paucity of personnel resources available to the Secretary to process Title VI and Section 504 complaints. 426 F.Supp. at 924–25. It was clear, however, that if the Secretary later exhibited an inability or unwillingness to conduct his review in a timely fashion the Court would seriously consider granting plaintiffs' request and proceed to consider the legality of Plan Omega without the benefit of an administrative record. *Id.* at 925.

40. *Id.* at 925 (citations omitted).

41. "[T]he Court is confronted with two separate, but closely related, questions. The first question involves whether Plan Omega will

tary was therefore requested to submit to the Court a report specifically delineating the agency's plan for processing the plaintiffs' complaint, its investigative methodology, and an estimate of the time period required to carry out the plan. On February 18, 1977, the Secretary submitted a report stating that the investigation of Plan Omega, conducted under the auspices of HEW's Office for Civil Rights ("OCR"), had begun on January 19 and would be completed on May 4, 1977; the report also identified the personnel assigned to carry out the investigation.[42]

Although HEW frankly admitted its inexperience in conducting Title VI and Section 504 reviews of proposed hospital relocations, the investigation undertaken by OCR was an extensive one which focused on "an assessment of the extent to which adequate provision is made for an equal delivery of services to both minority and majority beneficiaries or participants in the programs to be offered by the facilities under Plan Omega, including the accessibility of such services to minorities and handicapped persons, and the extent to which Plan Omega does or does not lead to the establishment of dual facilities."[43] Recognizing the complicated nature of the task it had been directed to perform, OCR's staff began by collecting and analyzing the information amassed by the parties, including information generated pursuant to a significant amount of discovery taken in connection with this law suit. For example, OCR had access to information produced by virtue of the plaintiffs' request that WMC collect data recording patient visits classified (1) by race, age, national origin, or handicap, (2) by zip code zone of origin, (3) by medical service, (4) by mode of payment, (5) by mode of transportation and (6) by time of admission. Information produced from this process enabled OCR to predict what the distribution of patients by race will be at the two locations envisioned under Plan Omega and to determine how priorities of patient use of transportation according to race or handicap will be affected by the relocation of certain services exclusively to Stanton. Moreover, OCR conducted its own study of Plan Omega's potential impact on Wilmington's community of minority and handicapped persons; for example, it analyzed demographic data in order to determine those areas where the minority population is concentrated and their proximity to the present and proposed location of hospital sources; it conducted on-site inspections of WMC's three existing facilities and interviewed supporting staff and personnel concerning delivery of health care now and as proposed under Plan Omega; and, it studied the transportation matrix of New Castle County as well as the area's existing and proposed public and private transit services in order to ascertain their influence upon the potential accessibility for urban residents of hospital resources moved to a suburban location. Finally, OCR reviewed as part of the record in this case thousands of pages of public hearing transcripts, minutes of HPC subcommittee meetings, and miscellaneous reports and studies generated during the process of local and state agency review of Plan Omega. After an unprecedented investigation which spanned more than six

have a discriminatory impact; the second question requires a detailed consideration of the relationship between [section] 1122 and Title VI and [Section] 504. The need for prompt resolution of the first question is readily apparent. If the Stanton hospital will eventually be built, minimization of cost is a goal which all parties can support. If the Stanton hospital will not be built because of a finding of discriminatory effect, alternate solutions may then be quickly developed because it appears that at least two of WMC's three hospitals are running some risk of loss of accreditation. The broader, second question, which deserves full consideration and timely disposition, does not warrant an expedited review and deserves mature reflection on the consequences and ramifications of any decision by the Court. Accordingly, it is the Court's view that the issues directly related to Plan Omega must be resolved separately." *Id.* at 924.

**42.** Docket Item 82 (Report To The Court Concerning Investigation Of Plan Omega With Respect To Alleged Title VI Violations).

**43.** *Id.* at 3.

months [44] and produced a massive record exceeding six thousand pages, OCR issued its July 5, 1977, "Letter of Findings" informing WMC that Plan Omega as then constituted would violate Title VI and Section 504.[45] In effect, the Letter of Findings represented HEW's conclusion that the investigative review had established a *prima facie* Title VI and Section 504 case against WMC.[46] OCR's report also pointed out that WMC had not satisfactorily rebutted the *prima facie* case by coming forward with evidence showing that the discriminatory effect was justified on the basis of a bona fide interest of WMC or that no alternative course of action could be taken that would enable that interest to be served with less discriminatory effect.[47] However, the Letter of Findings did identify numerous "factors which tend to . . . mitigate the disproportionate impact" [48] and enumerated 12 areas in which Plan Omega would have to be modified in order to achieve compliance with the statutes and the Secretary's regulations.[49]

The Secretary, heeding the Congressional admonishment to first attempt informal, voluntary efforts to secure compliance with the statutes in question, engaged in extensive negotiations with representatives of WMC in order to delimit the areas in which Plan Omega would have to be modified. After more than three months of discussions, an agreement was finally executed on November 1, 1977.[50] That agreement constitutes a binding and specifically enforceable contract (herein referred to as the "contract of assurances") the terms of which obligate WMC to modify and supplement those particular features of Plan Omega which HEW believes will otherwise have a discriminatory effect. It also embodies the Secretary's determination that Plan Omega, as modified, comports with Title VI and Section 504 and that there are no grounds for denying federal financial assistance to WMC so far as Plan Omega is concerned. The plaintiffs, however, do not share the Secretary's confidence in the adequacy of the assurances given by WMC; they contend that the contract of assurances was based upon inadequate and erroneous findings and that the Secretary's determination was not based on a consideration of the relevant factors. In any event, the Secretary's determination completes the administrative remedy process and this case is now in a posture that is suitable for judicial review.

## II. SCOPE OF JUDICIAL REVIEW

The first question the Court must consider is what standard Congress intended to govern judicial review of final agency action taken pursuant to Title VI and Section 504. In an order dated November 4, 1977, the Court expressed its view that the scope of judicial review in this case would be governed by the familiar "arbitrary and capricious" standard defined in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).[51] The plaintiffs have moved to modify that order, asserting that Title VI and Section 504, together with the unusual circumstances of this case, establish their right to a plenary judicial trial *de novo*.[52] The defendants, of course, oppose the motion, arguing that the plaintiffs' statutory rights will be adequately protected by this Court's "searching inquiry" into the administrative record. *See Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106

---

44. The Secretary had filed a report on May 4, 1977, indicating that an additional two months would be required to complete the investigative phase of this litigation. (Docket Item 97).

45. Docket Item 124 (Second Supplemental Report To The Court Concerning Investigation of Plan Omega With Respect To Alleged Title VI and Section 504 Violations) (hereinafter "Letter of Findings") *passim.*

46. *Id.* at 7, 21.

47. *Id.* at 7, 21–22.

48. *Id.* at 20, 21.

49. *Id.* at 22–27.

50. Docket Item 174 (Supplemental Agreement).

51. Docket Item 173 at 2.

52. Docket Item 198.

(1973); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

## A. The Statutory Framework

### 1. Title VI.

The Court must begin with the language and overall scheme of the legislation. In 1964 Congress proclaimed in section 601 of Title VI that no person shall be subjected to discrimination "on the ground of race, color, or national origin . . . under any program or activity receiving Federal financial assistance."[53] The broad language of this section reflects the clear Congressional policy against racial discrimination by the recipients of federal largesse and is predicated on the power of the federal government, when granting financial assistance under a host of federally sponsored programs, to specify the conditions and the terms upon which that assistance is granted.[54] Then, to effectuate its mandate, Congress provided in section 602 a clear, unequivocal directive to the various governmental departments and agencies responsible for dispersing federal funds:

"Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract . . . is authorized and directed to effectuate the provisions of section 2000d [section 601 of Title VI] with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. . . . Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement . . . or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. . . ."[55]

Pursuant to the mandate of section 602, various departments and agencies, including HEW, promulgated extensive regulations for implementing the broad proscription of section 601, all of which are basically identical.[56] Indeed, the regulations and the unequivocal language of section 602 underscore the Congressional objective: to eliminate discrimination by whatever means possible, including the suspension of federal assistance to recalcitrant recipients. But the suspension of federal aid was a sword which Congress cautioned the agencies to wield judiciously; it was envisioned as a weapon of last resort, designed to provide government agencies with "leverage" in their efforts to secure compliance with the statute.[57] Congress thus mandated that

53. 42 U.S.C. § 2000d provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

54. H.R.Rep.No. 914, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code Cong. & Admin.News pp. 2391, 2400–01. *See also Oklahoma v. Civil Service Comm'n,* 330 U.S. 127, 142–43 (1947).

55. 42 U.S.C. § 2000d–1.

56. *See, e. g.,* 7 C.F.R. § 15.1 *et seq.* (Dept. of Agriculture); 15 C.F.R. § 8.1 *et seq.* (Dept. of Commerce); 32 C.F.R. § 300.1 *et seq.* (Dept. of Defense); 45 C.F.R. § 80.1 *et seq.* (Dept. of Health, Education and Welfare); 24 C.F.R. § 1.1 *et seq.* (Dept. of Housing and Urban Development); 43 C.F.R. § 17.1 *et seq.* (Dept. of Interior); 28 C.F.R. § 42.101 to 42.112, 50.3 (Dept. of Justice); 29 C.F.R. § 31.1 *et seq.* (Dept. of Labor); 22 C.F.R. § 141.1 *et seq.* (Dept. of State); 49 C.F.R. § 21.1 *et seq.* (Dept. of Transportation).

57. *See* 110 Cong.Rec. 6544–47 (1964) (remarks of Senator Humphrey) ("Termination of assistance . . . is not the objective of [Title VI] . . . ; it is a last resort, to be used only if all else fails to achieve the real objective, the elim-

federal agencies attempt at the outset to secure compliance by informal, voluntary means.

The enforcement regulations promulgated by HEW in this regard provide an apt illustration. Applicants for federal funds under a program to which Title VI applies are required to furnish to HEW, as a condition to the extension of the assistance, a formal, written "assurance" that the applicant will operate in compliance with Title VI. 45 C.F.R. § 80.4(a)(1). Even then, however, the regulations require HEW to conduct "periodic compliance reviews" to ascertain whether recipients have kept faith with the "assurances." *Id.* at § 80.7(a). Further, a prompt investigation is begun whenever HEW has reason to believe, because of a complaint or other information, that a recipient is out of compliance with the statute or the regulations. *Id.* at § 80.7(b), (c). If an investigation indicates a recipient's practices fully comport with Title VI, the regulations merely require HEW to so inform the recipient and the complainant, if any, in writing. *Id.* at § 80.7(d)(2). On the other hand, if the investigation indicates a failure or threatened failure to comply, the recipient is advised of this finding, and informal methods are undertaken, if possible, to secure voluntary compliance. *Id.* at § 80.7(d)(1). If the informal efforts to achieve compliance are unsuccessful, however, section 602 directs HEW, as well as other government agencies, to effect compliance (1) by cutting off federal assistance upon an express finding on the record, and after the opportunity for a hearing, of a failure to comply,[58] or (2) by any other means authorized by law.[59]

■ Clearly, when Congress enacted Title VI and proclaimed an end to the use of federal funds in discriminatory programs, it also stated with precision the administrative measures available to enforce its mandate. From this elaborately and carefully constructed enforcement mechanism, it is manifest that the scheme of Title VI is essentially administrative.[60] But even with the safeguards built into the regulatory framework, Congress nonetheless believed it was necessary to provide for judicial review of departmental action as a "final barrier" against the possibility of federal officials improperly construing their statutory obligations or taking action inconsistent with those obligations. *See Adams v. Richardson,* 156 U.S.App.D.C. 267, 480 F.2d 1159, 1163–64 (1973) (en banc); *Taylor v. Cohen,* 405 F.2d 277, 279 (C.A. 4, 1968) (en banc).

Section 603 of Title VI in part reads: ". . . In the case of [agency] action . . . terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 2000d–1 [section 602 of Title VI] any person aggrieved (including any State or political subdivision thereof and any

---

ination of discrimination. . . .); *id.* at 13129 (remarks of Senator Ribicoff) ("The withholding of funds would be the last step to be taken only after the administrator or the agency had used every other possible means to persuade or to influence the person or the agency offending to stop the discrimination.").

**58.** 42 U.S.C. § 2000d–1. There first must be a determination that voluntary compliance cannot be secured; then, the recipient must be notified of the intention to terminate and be given a hearing. 45 C.F.R. § 80.8(c). The hearing, which is conducted by a hearing examiner, affords the recipient the usual protection of an adjudicatory proceeding such as the right to introduce relevant evidence, the right to counsel, and the right to cross-examine witnesses. The examiner's decision can be appealed first to a reviewing authority, then to the Secretary

and ultimately to the courts. 42 U.S.C. § 2000d–2; 45 C.F.R. §§ 80.10, 80.11.

**59.** 42 U.S.C. § 2000d–1. "Such other means may include, but are not limited to, (1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States . . ., or any assurance or other contractual undertaking, and (2) any applicable proceeding under State or local law." 45 C.F.R. § 80.8(a). *See also id.* at § 80.8(d).

**60.** *Accord, Brown v. Weinberger,* 417 F.Supp. 1215, 1220 (D.D.C.1976); *Johnson v. County of Chester,* 413 F.Supp. 1299, 1310 (E.D.Pa.1976); *Feliciano v. Romney,* 363 F.Supp. 656, 672 (S.D.N.Y.1973).

agency of either) may obtain judicial review of such action in accordance with section 1009 of Title 5 [§ 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701–06] and such action shall not be deemed committed to unreviewable agency discretion within the meaning of that section." [61]

While the above language contemplates judicial review of action "terminating or refusing to grant" financial assistance, still it plainly indicates such review is pursuant to the judicial review chapter of the Administrative Procedure Act, 5 U.S.C. §§ 701–06, which does not restrict standing to seek judicial review to applicants or grantees of federal funding who believe themselves aggrieved by agency action.[62] Moreover, at least three courts have held that aggrieved persons may seek judicial review to challenge the failure or refusal of federal officials to terminate funding to programs that purportedly engaged in discrimination.[63]

It also seems clear that the language of section 603 contemplates not an independent cause of action in federal court but an intermediate level of judicial review to determine the propriety of an agency action or proceeding. In *Adams v. Richardson,*[64] for example, certain black students, citizens and taxpayers brought suit against the Sec-

retary of HEW and others, alleging that HEW had been derelict in its duty to enforce Title VI and had failed or refused to terminate funding to various segregated public educational institutions. The district court agreed that HEW had consciously abdicated its statutory responsibilities and ordered it to institute compliance and enforcement proceedings against the recalcitrant schools.[65] On appeal, the Circuit Court, after modifying the higher education aspect of the lower court's injunctive order, affirmed in all other respects the relief granted.[66] Moreover, it specifically noted and approved the nature of the judicial proceeding instituted by the plaintiffs:

". . . the purpose of the District Court . . . is not to resolve particular questions of compliance or noncompliance [with Title VI]. It is, rather, to assure that the agency properly construes its statutory obligations, and that the policies it adopts and implements are consistent with those duties . . . ." [67]

The nature of the judicial review sanctioned in *Adams,* therefore, evinces an appreciation of the distinct function of the reviewing court vis-a-vis the administrative role envisioned by Congress when it enacted Title VI. To read section 603 as authorizing

**61.** 42 U.S.C. § 2000d–2. Section 603 also provides that department or agency action "shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds." *Id.* Because no federal assistance statute implicated in this case expressly provides for review of the defendant Secretary's decision as it relates to Plan Omega, this provision of section 603 is inapplicable. *Compare Hardy v. Leonard,* 377 F.Supp. 831, 835–36 (N.D.Cal.1974), *with Gardner v. Alabama Dept. of Pensions & Security,* 385 F.2d 804, 810–11 (C.A. 5, 1967), *cert. denied,* 380 U.S. 1046, 88 S.Ct. 773, 19 L.Ed.2d 839 (1968).

**62.** 5 U.S.C. § 702 extends the right of review to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." Furthermore, the APA defines agency action to include "the whole or a part of an agency rule . . . sanction, relief, or the equivalent *or denial thereof,* or failure to act." 5 U.S.C. § 551(13) (emphasis added).

**63.** *Adams v. Richardson, supra; Gautreaux v. Romney,* 448 F.2d 731 (C.A. 7, 1971); *Hardy v. Leonard, supra.*

**64.** 356 F.Supp. 92 (D.D.C.), *aff'd,* 156 U.S.App. D.C. 267, 480 F.2d 1159 (1973) (en banc).

**65.** 356 F.Supp. at 94–100. The district court's opinion indicates that HEW had neglected for several years to commence enforcement proceedings against school districts it had earlier found out of compliance with Title VI.

**66.** 156 U.S.App.D.C. at 269, 273, 480 F.2d at 1161, 1165.

**67.** *Id.* at 1162–63, *citing Burlington Truck Lines v. United States,* 371 U.S. 156, 165–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *Board of Public Instruction of Taylor County v. Finch,* 414 F.2d 1068, 1073–75 (C.A. 5, 1969); *Elgin Joliet & Eastern R. R. Co. v. Benj. Harris & Co.,* 245 F.Supp. 467, 472 (N.D.Ill.1965).

private persons to institute a *de novo* proceeding in a federal court, in the first instance, for the purpose of determining whether a particular recipient is or is not complying with Title VI, would not only distort the plain meaning of the statute, but would also "propel the court[s] into the domain which Congress has set aside exclusively for the administrative agency." *Securities & Exchange Comm'n v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *see Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 166–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

The legislative history, moreover, confirms that Congress intended to accord aggrieved persons a right to post-administrative remedy judicial review under the APA, as contradistinct from an independent and *de novo* proceeding in the federal courts. While the majority reports of the Senate and House Judiciary Committees are bereft of much explanation regarding the judicial review provided by section 603,[68] the minority views of two members of the House Judiciary Committee appear to indicate the general understanding of that question at the time the House bill (H.R. 7152) was favorably reported on. Representatives Poff and Cramer issued a separate minority statement which expressed their concern regarding the consequences of vesting administrative agencies with the power to suspend financial aid under programs authorized and founded by the legislature, subject only to the right of *a posteriori* judicial review. As the minority statement put it:

> "It will be seen that the judicial *review* authorized by this legislation (as distinguished from an *original* judicial proceeding) is keyed to the Administrative Procedure Act. . . . [I]n all respects, this proceeding is a *review* rather than a *trial*.
> . . .
> The limited review procedure authorized in the Administrative Procedure Act was justified when [Title VI] was written on the grounds that administrative agencies were supposed to have more expertise in their particular fields than the courts themselves. That is why the courts were allowed to reverse administrative findings only when they were not supported by substantial evidence, were clearly erroneous, or were contrary to law. Outside the Department of Justice itself, no administrative agency can claim to have any special expertise in the field of racial discrimination. Accordingly, the theoretical justification for the limited procedure established in the Administrative Procedure Act does not exist, and because it does not exist, tying the judicial remedy of [T]itle VI to the Administrative Procedure Act is not justified because it does not fully protect the rights of those charged with racial discrimination in the administration of Federal aid programs.
>
> The foregoing consideration has to do with the judicial remedy which would be made available to those charged with acts of discrimination. It should also be remembered that this judicial procedure is available to those who bring charges of discrimination and who are aggrieved by negative ruling of the administrative agency. . . ."[69]

---

**68.** The report of the House Committee did contain an explanation of the explicit provision in section 603 that agency action shall not be deemed committed to unreviewable agency discretion within the meaning of section 10 of the APA (5 U.S.C. § 702). The report stated:

> "The purpose of this provision is to obviate the possible argument that although section 603 provides for review in accordance with section 10, section 10 itself has an exception for action 'committed to agency discretion,' which might otherwise be carried over into section 603. It is not the purpose of this provision of section 603, however, otherwise to alter the scope of judicial review as pres-

ently provided in section 10(e) [5 U.S.C. § 706] of the Administrative Procedure Act." H.R.Rep.No. 914, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code Cong. & Admin.News pp. 2391, 2401.

**69.** *Id.* at 2462, 2469–70 (emphasis in original). These contemporaneous comments are particularly persuasive since, if Congressmen Poff and Cramer had reason to believe that section 603 authorized or permitted an original and independent cause of action *unconnected* to the administrative regulations, they surely would have commented to that effect when voicing in writing their objections to its passage.

The views expressed in the minority statement were not contradicted by the majority report nor by any other member of the House Judiciary Committee; indeed, the Chairman of that Committee, Representative Celler, reinforced the view that section 603 only authorizes a right to post-administrative remedy judicial review. During the lengthy floor debates on the bill he observed that

"the [administrative] record is made and goes to the court. If the court feels that there is insufficient evidence [it] may remand the case back to the agency for additional evidence. The agency may have an additional hearing and obtain more evidence. Then the case would go back to the district court . . . to determine the case and make a decision, affirming or rejecting the decision of the agency.

. . . . .

All we do in [section 603] is what we have done in all agencies. . . . We provide sufficiently for relief to a party aggrieved. . . . [W]e provide in the Administrative Procedure Act for a review to the party aggrieved, to the court on the basis of the record that has been made." [70]

Although there was scant consideration of the question in the Senate, the remarks of its members during the debates conform to the views of those in the House. Senator Byrd, for instance, noted that the statute clearly "provides for judicial review of agency actions upon the demand of aggrieved persons," although such review is tied to the review provisions of the APA and, therefore, "is to be distinguished from an original judicial proceeding. . . . The proceeding is a review rather than a trial." [71] The remarks of other members of the Senate parallel those of Senator Byrd and dispel any notion that section 603 was intended to accord persons an independent cause of action free of the review requirements of the APA.[72] To the contrary, the right of review based on the APA was perceived by Congress as "a barrier against any *arbitrary or capricious act* . . . on the part of any administrator in carrying out" his Title VI responsibilities.[73]

2. *Section 504.*

■ The language of Section 504 of the Rehabilitation Act of 1973 is almost identical to that of section 601 of Title VI and expresses "a policy of nondiscrimination against otherwise qualified handicapped individuals with respect to participation in or access to any program which is in receipt of Federal financial assistance." [74] Unlike its Title VI prototype, Section 504 contains no additional provisions requiring administrative rulemaking or enforcement procedures, although it seems unlikely that Congress intended its prohibitory command to be self-executing. While the legislative history accompanying the statute is largely unilluminating,[75] the history of subsequent clarifying amendments [76] makes it clear that

70. 110 Cong.Rec. 2503 (1964).

71. 110 Cong.Rec. 12320–21 (1964).

72. *E. g., id.* at 8979 (remarks of Senator Humphrey); *id.* at 9124 (remarks of Senator Pastore); *id.* at 13130 (remarks of Senator Ribicoff); *id.* at 13383 (remarks of Senator McClellan); *id.* at 13415–16 (remarks of Senator Morse); *see also id.* at 2501–06 (colloquy between Reps. Celler, Griffin & Lindsay).

73. *Id.* at 13416 (remarks of Senator Morse) (emphasis added).

74. 1973 U.S.Code Cong. & Admin.News p. 2123. Section 504 provides:
"No otherwise qualified handicapped individual in the United States, as defined in section 706(6), shall, solely by reason of his handi-

cap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." (29 U.S.C. § 794).

75. *See* 1973 U.S.Code Cong. & Admin.News pp. 2123, 2143.

76. Rehabilitation Act Amendments of 1974, Pub.L.No. 93–516, 88 Stat. 1617. These amendments redefined the term "handicapped individual" and the legislative history regarding them has persuasive value as a subsequent expression of Congressional intent. *Red Lion Broadcasting Co. v. Federal Trade Comm'n,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

Congress contemplated the swift promulgation of comprehensive regulations effectuating the rights guaranteed by Section 504.[77] *Lloyd v. Regional Transportation Authority*, 548 F.2d 1277, 1281–82 (C.A. 7, 1977); *Cherry v. Mathews*, 419 F.Supp. 922, 924 (D.D.C.1976).

■ On April 28, 1976, Executive Order 11914, 41 Fed.Reg. 17871 (April 29, 1976) was issued. This Order, the functional equivalent of section 602 of Title VI, authorizes HEW and other federal agencies responsible for disbursing federal monies

"to adopt rules, regulations and orders to ensure that recipients of federal aid are in compliance with Section 504. If compliance cannot be secured voluntarily, it may be compelled by suspension or termination of federal assistance after a hearing or by 'other appropriate means authorized by law.' HEW is given the responsibility of establishing standards for who are 'handicapped individuals' and for determining what are 'discriminatory practices' as well as coordinating the imple-

mentation of Section 504 by all federal agencies."

*Lloyd v. Regional Transp. Auth., supra,* 548 F.2d at 1281. On May 4, 1977, HEW issued final regulations implementing Section 504.[78] Specifically, in connection with the instant litigation, it is noteworthy that § 84.4 of the regulations provides:

"(b) Discriminatory actions prohibited.

. . . . .

(5) In determining the site or location of a facility, an applicant for assistance or a recipient may not make selections (i) that have the effect of excluding handicapped persons from, denying them the benefits of, or otherwise subjecting them to discrimination under any program or activity that receives or benefits from Federal financial assistance or (ii) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the program or activity with respect to handicapped persons." [79]

**77.** "It is intended that sections 503 and 504 be administered in such a manner that a consistent, uniform, and effective Federal approach to discrimination against handicapped persons would result. Thus, Federal agencies and departments should cooperate in developing standards and policies so that there is a uniform, consistent Federal approach to these sections. The Secretary of the Department of Health, Education, and Welfare, because of that Department's experience in dealing with handicapped persons and with the elimination of discrimination in other areas, should assume responsibility for coordinating the section 504 enforcement effort and for establishing a coordinating mechanism with the Secretary of the Department of Labor to ensure a consistent approach to the implementation of sections 503 and 504. The conferees fully expect that H.E.W.'s section 504 regulations should be completed by the close of this year. Delay beyond this point would be most unfortunate since the Act (P.L. 93–112) was enacted over one year ago—September 26, 1973.

The conferees noted, and the committee reiterates, that Executive Order No. 11758, section 2, delegates to the Secretary of Labor the responsibility for carrying out the responsibilities embodied in section 503 of the Rehabilitation Act of 1973, and a similar delegation of responsibility to the Secretary of HEW is urged to carry out on a Government-

wide basis those responsibilities embodied in section 504."
1974 U.S.Code Cong. & Admin.News p. 6391.

**78.** 42 Fed.Reg. 22676–94 (May 4, 1977). The regulations, which became effective on June 3, 1977, are intended to be codified at 45 C.F.R. P. 84. HEW's Notice of Intent to Issue Proposed Rules was published on May 17, 1976, 41 Fed. Reg. 20296, and its proposed regulations appear at 41 Fed.Reg. 29560 (July 16, 1976).

**79.** 42 Fed.Reg. 22679 (May 4, 1977). The following provisions are also relevant in the context of health care delivery systems:
§ 84.52 Health, welfare, and other social services.
(a) *General.* In providing health, welfare, or other social services or benefits, a recipient may not, on the basis of handicap:
(1) Deny a qualified handicapped person these benefits or services;
(2) Afford a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered nonhandicapped persons;
(3) Provide a qualified handicapped person with benefits or services that are not as effective (as defined in § 84.4(b)) as the benefits or services provided to others;
(4) Provide benefits or services in a manner that limits or has the effect of limiting the participation of qualified handicapped persons; or

This regulation parallels HEW's site selection regulation implementing Title VI. *See* 45 C.F.R. § 80.3(b)(3). The parallels do not end there, however. The Section 504 regulations reiterate the "voluntary compliance" philosophy of Title VI and its regulatory framework by requiring applicants to furnish "assurances" to HEW as a condition to the extension of aid and by encouraging voluntary, remedial compliance measures necessary to overcome the effects of discrimination against the handicapped.[80] Moreover, until the adoption of consolidated procedural regulations governing all of the civil rights statutes for which HEW has enforcement duties, the "procedural provisions applicable to Title VI of the Civil Rights Act of 1964," found in 45 C.F.R. §§ 80.6–.10 and Part 81, are expressly incorporated by reference into the Section 504 regulations.[81] Nor is the close resemblance between the Title VI and the Section 504 administrative remedial machinery an accidental or an unintended result. The legislative history indicates that Congress envisioned parallel enforcement mechanisms:

"Section 504 was patterned after, and is almost identical to, the antidiscrimination language of section 601 of the Civil Rights Act of 1964, 42 U.S.C. 2000d–1 (relating to race, color, or national origin), and section 901 of the Education Amendments of 1972, 42 U.S.C. 1683 (relating to sex). The section therefore constitutes the establishment of a broad government policy that programs receiving Federal financial assistance shall be operated without discrimination on the basis of handicap. . . .

The language of section 504, in followig [sic] the above-cited Acts, further envisions the implementation of a compliance program which is similar to those Acts, including promulgation of regulations providing for investigation and review of recipients of Federal financial assistance, attempts to bring non-complying recipients into voluntary compliance through informal efforts such as negotiation, and the imposition of sanctions against recipients who continue to discriminate against otherwise qualified handicapped persons on the basis of handicap. Such sanctions would include, where appropriate, the termination of Federal financial assistance to the recipient or other means otherwise authorized by law. Implementation of section 504 would also include pre-grant analysis of recipients to ensure that Federal funds are not initially provided to those who discriminate against handicapped individuals. Such analysis would include pre-grant review procedures and a requirement for assurances of compliance with section 504. This approach to implementation of section 504, which closely follows the models of the above-cited anti-discrimination provisions, would ensure administrative due process (right to hearing, right to review), provide for administrative consistency within the Federal government as well as relative ease of implementation, and permit a judicial remedy through a private action."[82]

Further, the above language indicates that Congress, consistent with the provisions of Title VI, intended aggrieved persons under Section 504 to have a judicial remedy in the form of judicial review of administrative action rather than an independent, original cause of action in the district courts. *Cf. Cannon v. University of Chicago*, 559 F.2d 1063 (C.A. 7, 1976), *petition for cert. filed,* 46 U.S.L.W. 3438 (Dec. 28, 1977) (Title IX); *Lloyd v. Regional Transp. Auth., supra,* 548 F.2d at 1277 (Section 504).

The plaintiffs, however, strenuously insist that Title VI and Section 504 implicitly

---

(5) Provide different or separate benefits or services to handicapped persons except where necessary to provide qualified handicapped persons with benefits and services that are as effective as those provided to others.
*Id.* at 22685.

**80.** *Id.* (§§ 84.5, .6).

**81.** *Id.* at 22685 (§ 84.61); for a brief description of HEW's Title VI enforcement procedures, *see* page 293 *supra.*

**82.** 1974 U.S.Code Cong. & Admin. News pp. 6390–91.

authorize a private action to enforce their terms and that in the circumstances of this case such an action entails a plenary judicial trial *de novo.* In support of their argument, the plaintiffs rely heavily upon a series of cases brought by private plaintiffs under Title VI and Section 504. *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Lloyd v. Regional Transp. Auth., supra; Uzzell v. Friday,* 547 F.2d 801 (C.A. 4, 1977); *Bossier Parish School Board v. Lemon,* 370 F.2d 847 (C.A. 5, 1967); *Gurmankin v. Costanzo,* 411 F.Supp. 982 (E.D. Pa.1976), *aff'd,* 556 F.2d 184 (C.A. 3, 1977); *Laufman v. Oakley Bldg. & Loan Co.,* 408 F.Supp. 489 (S.D.Ohio 1976).[83] The Secretary, adhering to the position recently taken by the government before the Supreme Court in *Bakke v. Regents of the University of California,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), *cert. granted,* 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (Feb. 22, 1977) (No. 76–811), concedes that a private action may be brought against a recipient of federal assistance under Title VI and Section 504, but contends that the plaintiffs in this case elected to enforce their rights through the administrative process and therefore are entitled only to judicial review of administrative action.

None of the cases cited by the plaintiffs, however, support the view that Title VI and Section 504 implicitly confer upon private parties an independent cause of action

in the form of a trial *de novo* in the circumstances of this case. First of all, the Court does not read those cases as broadly as the plaintiffs, because most of them were expressly brought under 42 U.S.C. § 1983 to redress violations of rights provided by Title VI rather than directly under the aegis of the statute itself. *E. g., Uzzell v. Friday, supra.* Therefore, language in those decisions indicating that the private party had stated a claim under Title VI was merely another way of saying that the allegations of statutory violations were sufficient to state a cause of action under § 1983. Even in those cases where § 1983 was not mentioned, it seems likely that the courts were in fact relying upon it to establish a cause of action since the suits were brought against public agencies acting under color of state law. In both *Lau* and *Bossier,* for example, a class suit by a large group of minorities was brought against a public school system to enforce their constitutional and statutory rights to an equal educational opportunity. No jurisdictional issue was presented to the Supreme Court in *Lau* but the plaintiffs' complaint shows that their constitutional and statutory claims were explicitly premised on 42 U.S.C. § 1983.[84] In *Bossier,* the Fifth Circuit merely held that the plaintiffs had "standing" under Title VI to enforce a national constitutional right. 370 F.2d at 851. Because there apparently was no authority at that time for bringing

---

**83.** At one point, the plaintiffs appeared to rely upon *Chandler v. Roudebush,* 425 U.S. 840, 96 S.Ct. 1949, 1956, 48 L.Ed.2d 416 (1976) as establishing their right to a *de novo* trial. (Docket Item 181 at 12). In *Chandler,* however, the Supreme Court considered the question whether the Equal Employment Opportunity Act of 1972, which amended Title VII of the Civil Rights Act of 1964 to extend its protection to federal employees, accorded the latter the same right to a trial *de novo* of employment discrimination claims as "private sector" employees enjoy under Title VII. The Court answered in the affirmative, noting that the plain language of the 1972 amendment as well as its legislative history indicated Congress' intent to extend to federal employees a right to *de novo* judicial trial of their Title VII complaints rather than mere judicial review of employing agency determinations. *Id.* at 852, 862. Obviously, judicial construction of an amendment to Title VII is not very supportive in the context of Title VI

and Section 504. Furthermore, the precedential value of *Chandler* in the instant case is completely undercut by the fact that the language of Title VI and Section 504 and their respective legislative histories belie any intent by Congress to authorize, implicitly or explicitly, a judicial trial *de novo.*

**84.** The jurisdictional statement in the *Lau* plaintiffs' complaint read:

"Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and by 28 U.S.C. § 1343(3)(4), *which provide original jurisdiction in suits authorized by 42 U.S.C. § 1983.*" Plaintiffs' Complaint for Injunctive and Declaratory Relief, *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (emphasis added), *quoted in Cannon v. University of Chicago,* 559 F.2d 1063, 1083 n.7 (C.A. 7, 1976).

a suit directly under the Fourteenth Amendment to enforce a right to equal protection of the law absent an independent statutory basis, it is likely that that action was brought under the authority of § 1983 as well. Thus, since most of these cases arose under 42 U.S.C. § 1983, the Court declines to attach to them the meaning which the plaintiffs so ardently champion. These cases, as well as any decision relying on them, cannot be read as supporting the proposition that the plaintiffs are entitled to bring an independent cause of action directly under the auspices of Title VI or Section 504 which would warrant a judicial trial de novo. Thus, Lau and similar cases are of no help to the plaintiffs because they are unable to invoke 42 U.S.C. § 1983, having sued a private hospital not acting under color of state law.

Second, some of the cases relied upon by the plaintiffs permitted a class suit to proceed as an independent cause of action directly under Section 504 against a *public* agency only because the administrative remedy established under the statute to protect their rights had proven to be wholly inadequate or nonexistent. For example, in *Lloyd v. Regional Transp. Auth., supra,* the Seventh Circuit held that the representatives of a large class of handicapped persons could bring a private action directly under Section 504 against a recipient of federal financial assistance to enforce the affirmative rights granted by that legislation. 548 F.2d at 1286–87. The Court's holding, however, was explicitly based on the fact that the administrative procedures for enforcing Section 504 were still in their embryonic stages and thus were inadequate to vindicate the plaintiffs' rights. The Seventh Circuit suggested, moreover, that the existence of a meaningful administrative enforcement mechanism would relegate the plaintiffs to a more limited form of post-agency action judicial review.[85] *Id.* at 1286 n.29. Obviously, *Lloyd* and similar cases

are inapposite here because the Secretary has carried out his duty to enforce the statutes through appropriate implementing regulations which have not been shown to be inadequate, let alone nonexistent. Thus, neither the cases cited by the parties nor any reported decisions discovered by the Court's own research provide any real support for the plaintiffs' argument that Title VI and Section 504 create an implied right to a private *de novo* judicial remedy in favor of persons who have a grievance based upon discrimination against a private hospital receiving federal funds.

The Court recognizes, however, that there are occasions when statutes which are silent as to the existence of a judicial remedy may be interpreted by courts as giving rise to an implied private cause of action. *See, e. g., Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *Allen v. Board of Election,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). But to construe Title VI and Section 504 as implicitly permitting a private judicial remedy which would warrant a *de novo* trial in this case would do violence to the evident intent of Congress. For the violation of the affirmative rights granted by Title VI and Section 504, Congress afforded a private administrative remedy. As previously stated, that remedy empowers any interested person who deems himself discriminated against to file a complaint before the agency which is authorized to extend the federal aid. Efforts to secure voluntary compliance, as mandated by Congress, may be followed by formal hearings and, if necessary, the withdrawal of funds in order to end discrimination by the offending party. Finally, there is a right to judicial review of the agency's decision regarding the complaint. Clearly, Congress vested in the appropriate administrative agencies rather than in the federal courts the initial responsibility to adjudicate

**85.** The Secretary's final Section 504 regulations became effective about six months after the *Lloyd* opinion was handed down. *See* note 78 *supra.*

The Third Circuit was recently presented the question whether Section 504 impliedly authorizes a private judicial remedy, but declined to answer it. *Gurmankin v. Costanzo,* 556 F.2d 184 (C.A. 3, 1977).

Title VI and Section 504 complaints and to enforce the policies intended to be effectuated by those laws. By placing such a premium on agency expertise, the statutes evidence the Congressional intent to exclude parallel judicial remedies.

"A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies. 'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.'" *National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) *quoting Botany Worsted Mills v. United States,* 278 U.S. 282, 289, 4 S.Ct. 129, 73 L.Ed. 379 (1929).

The teaching of these Supreme Court cases is clear: Where Congress has not specifically provided for a certain remedy, courts should not lightly imply one, particularly where other means of enforcement have been provided. *See Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). Nothing in the language of Title VI or Section 504, nor anything the Court has found in their legislative histories, would appear to authorize an independent cause of action in a federal court that would warrant a *de novo* trial. Moreover, implication of such a private judicial remedy would be inconsistent with the legislative intent and the underlying purposes of the statutory scheme. It seems clear from the face of the statutes and the regulations designed to implement them that by providing private parties an administrative but not a judicial remedy in which to raise grievances based on discrimination, Congress' purpose was to entrust administrative agencies with the discretion to review and resolve such grievances. Therefore, to hold, as the plaintiffs insist we must, that a trial *de novo* is required to judicially ascertain whether Plan Omega will violate Title VI and Section 504 seems unsound, for it would largely transfer the power to enforce those statutes from the Secretary, where Congress put it, to the district courts. The Secretary, after investigating the plaintiffs' charges against Plan Omega, found the charges to have merit and then exercised his discretionary power to formulate an appropriate remedy through voluntary compliance. Judicial review of that action, as opposed to a *de novo* trial, will minimize the opportunity for a reviewing court to substitute its discretion for that of the agency and reduces the risk that the Court's mode of review will short-circuit functions properly within the administrative sphere. *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); *United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

Nor is the Court persuaded by the plaintiffs' argument that implication of a private judicial remedy is consistent with the legislative objectives of Title VI and Section 504 because it would facilitate enforcement of the Congressional policy against discrimination in federally funded programs. Besides the fact that it ignores the question whether implication of such a remedy is consistent with the purposes of the legislative scheme, the "private attorneys general" argument goes too far. Enforcement of every federal statute would be assisted by implying a private cause of action to parallel an already existing administrative mechanism created by Congress. But such a result in itself is not an acceptable rationale for expanding the statutory remedies explicitly provided by the legislature.

In short, based on the evident legislative intent and in the face of a carefully constructed scheme of consolidated enforcement regulations implementing Title VI and Section 504, the Court concludes that in the circumstances of this case the plaintiffs are only entitled to judicial review of the agency action in question under the review standards of the Administrative Procedure Act.[86] The Court hastens to add, however,

---

**86.** The Secretary contemplates no further administrative proceedings under Title VI or Section 504 concerning Plan Omega and, therefore, the signing of the contract of assurances con-

that had the plaintiffs alleged a violation of a fundamental federal constitutional or statutory right for which no remedy had been created by the Congress, or for which the available remedies had proven inadequate for protecting those rights, the result the Court reaches today might well be different. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Steele v. Louisville & Nashville R. R.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

3. *Review Under the Administrative Procedure Act.*

In every case involving judicial review of agency action under the APA the reviewing court must set aside action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or action taken contrary to various constitutional, statutory, or procedural requirements, *id.* §§ 706(2)(B), (C), (D). In two additional, narrowly defined instances, agency action must be set aside if the court finds that the action was not supported by "substantial evidence," *id.* § 706(2)(E), or if, after a trial *de novo,* the court concludes the action was "unwarranted by the facts," *id.* § 706(2)(F). *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–15, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ The substantial evidence review of § 706(2)(E) properly applies only to cases where agency action is predicated upon a public adjudicatory hearing (5 U.S.C. §§ 556, 557), or where agency action is taken after a rulemaking hearing required by statute (5 U.S.C. § 553). *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 414, 91 S.Ct. 814; *Camp v. Pitts,* 411 U.S. 138, 141, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). *See generally,* 2 K. Davis, *Administrative Law Treatise* § 13.08 (1958). Neither circumstance applies here. First, the

Secretary's determination that a modified Plan Omega will satisfy the civil rights statutes was not based on an adjudicatory hearing; the Secretary's regulations provide for a trial-type hearing only when he seeks to suspend federal aid to an uncompliant recipient. The present proceedings do not involve a decision to terminate assistance that would have triggered an adjudicatory proceeding because compliance was voluntarily achieved through the informal settlement process encouraged under the statutes. Second, the Secretary's action plainly does not qualify as an exercise of his rulemaking power. *See* 5 U.S.C. § 551(4), (5); *PBW Stock Exchange, Inc. v. SEC,* 485 F.2d 718 (C.A.3, 1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1992, 40 L.Ed.2d 558 (1974). *See generally* 2 K. Davis, *Administrative Law Treatise* § 5.01 (1958).

■■ *De novo* review of administrative decisions under the APA is proper in only two situations: (1) where the agency action is adjudicatory in nature and the reviewing court finds that the administrative fact finding procedures were inadequate, and (2) "when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 415, 91 S.Ct. at 823. The latter situation is inapplicable because this is not a suit to enforce agency action; nor have the parties raised issues that were not before the Secretary at the time of his disputed decision. Still, the plaintiffs argue that § 706(2)(F) applies and that there must be a trial *de novo* because the Secretary's determination was "adjudicatory in nature" and was based on inadequate and erroneous findings of fact. The Court, however, is not reviewing the record of a formal hearing or other proceeding in which an administrator has made findings regarding disputed issues of fact. The "facts" concerning Plan Omega's impact on minorities and the handicapped are merely inferences as to the future based on demonstrable evidence

---

stitutes final departmental action. *See* Docket Items 170 at 2; 171 at 1; 173 at 2, par. A; 174 at 3. Furthermore, no statute expressly precludes judicial review, and the terms of Title VI

and Section 504 are not so broad that there is no law to apply. *See* 5 U.S.C. § 701(a)(1), (2); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct 814 (1971).

gathered from a variety of sources. The plaintiffs argue that the evidence relied on by the Secretary in making predictions about the impact of Plan Omega was inadequately adduced and irrationally applied. But whether the Secretary adequately identified the factors he relied on and whether his policy choices rationally follow from the evidence adduced are questions implicated by the arbitrary and capricious test rather than by the *de novo* review standard. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 284–85, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). The pertinent inquiry is whether the procedures employed by HEW to adduce the determinable evidence were inadequate as a matter of law. The factual information contained in the record was gathered by solicitation of data and written reports prepared by WMC and the plaintiffs, on-site inspections by members of the OCR investigative team, review of the litigants' answers to interrogatories, responses to requests for production, and deposition testimony connected with this case, reports of experts retained by HEW and the plaintiffs, demographic data furnished by the United States Bureau of Census, and empirical studies of the transportation matrix in the Greater-Wilmington area. It also appears that the data collection design employed by HEW was suggested by the plaintiffs and that the plaintiffs had access, and indeed contributed to, the investigative review process. The plaintiffs also met with members of HEW's investigative team on several occasions, an opportunity which enabled them to discuss the review methodology and, at least to some extent, help sharpen the investigation's focus on the issues. While the investigation surely includes instances of human error, these errors are not the result of HEW's "fact-finding procedures." Moreover, even if the Court were to find that the existing agency record does not support the Secretary's decisions, the proper remedy would be to re-

mand the case for further consideration rather than conduct a plenary trial *de novo. See Camp v. Pitts, supra,* 411 U.S. at 140–41, 93 S.Ct. 1241.

■■■ The appropriate standard for review is thus whether the Secretary's decision concerning Plan Omega was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In making that analysis, the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 823; *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra,* 419 U.S. at 285–86, 95 S.Ct. 438. This standard of review is a deferential, although not a cursory, one. Ordinarily, courts defer to an agency's choice of remedies, *Diamond Ring Ranch v. Morton,* 531 F.2d 1397, 1407 (C.A. 10, 1976), and the agency action is presumed to be valid. *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 415, 91 S.Ct. 814; *United States v. Chemical Foundation,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926). A court must even affirm a decision with which it disagrees so long as the agency considered the relevant factors and a rational basis exists for its decision. Agency action that is arbitrary surely may be set aside, but a court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. 814; *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra,* 419 U.S. at 290, 95 S.Ct. 438. *Cf. United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 749, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972).

■■■ The arbitrary and capricious standard of review, however, is not a ritualistic procedure by which courts summarily endorse agency decisions as correct. To the contrary, a reviewing court must engage in a "substantial inquiry" into the facts, an inquiry that is "searching and careful," in order to determine whether the agency de-

cision was based on a consideration of relevant factors, *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 415–16, 91 S.Ct. 814, and whether the facts and the decision are rationally connected. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra,* 419 U.S. at 290, 95 S.Ct. 438; *United States v. Allegheny-Ludlum Steel Corp., supra,* 406 U.S. at 749, 92 S.Ct. 1941. In complicated cases such as this one, moreover, the court must undertake an intensive review of the evidence relied upon by the agency in reaching its decision. Although this close scrutiny enables the Court to satisfy itself "that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent," it is not intended to permit the Court to second-guess the agency's expert decision-maker in the exercise of his specialized, experienced judgment. *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 541 F.2d 1, 34–37 (en banc), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2660, 49 L.Ed.2d 394 (1976).

Therefore, the Court has no authority to concern itself with the desirability or rationality of Plan Omega *per se*; the Court's duty is to see to it that the Secretary's decision receives that careful consideration which the statutes contemplate. In other words, the Court must decide whether the Secretary considered the relevant factors and reached a rationally supportable decision in concluding that the contract of assurances is an adequate remedy to bring Plan Omega into compliance with Title VI and Section 504.[87] The Secretary had the opportunity to carefully study the evidence generated through discovery in this case, the record of months of hearings and studies produced by the local and state agency review process, to conduct his own investigative review, and he now has arrived at a decision to approve the legality of a modified Plan Omega. The Court must review the *Secretary's* decision; it cannot make the decision itself.

In applying the arbitrary and capricious test, the Court properly may consider the agency's developed expertise and any evidence referenced by the agency or otherwise placed in the record. *Market St. Ry. v. Railroad Comm'n,* 324 U.S. 548, 559–61, 65 S.Ct. 770, 89 L.Ed. 1171 (1945); *City of Chicago v. FPC,* 147 U.S.App.D.C. 312, 458 F.2d 731, 741–45 (1971), *cert. denied,* 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972). But the Supreme Court has cautioned that a court reviewing an agency action under this standard of review should focus on the "administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts, supra,* 411 U.S. at 142, 93 S.Ct. at 1244. The rule is not inflexible, however, and supplemental information proffered by the agency may be considered by the Court in order to understand otherwise inexplicable administrative action. *Id. See also Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 419–20, 91 S.Ct. 814; *Independent Meat Packers Ass'n v. Butz,* 526 F.2d 228, 239 (C.A.8, 1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). Or, if the bare record fails to "disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard." *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 420, 91 S.Ct. at 825.

In this case, the Court has before it the full administrative record, which includes numerous studies, transcripts of public hearings, statistical evidence, the agency's informal findings embodied in the "Letter

---

87. In addition, *Overton Park* instructs reviewing courts to consider whether the agency acted within the scope of its authority and discretion and whether the agency followed its own procedural regulations. 401 U.S. at 415–16, 91 S.Ct. 814. It is clear in this case, and no party disputes, that the Secretary acted within his authority in seeking to bring Plan Omega into compliance with the statutes and that he followed the procedures prescribed in his regulations.

of Findings," the remedy set forth in the contract of assurances, and a 340 page report which explicates the agency's investigative methodology, the meaning of the evidence relied upon and the evidence discarded, and its ultimate conclusions. The plaintiffs, however, have asked for permission to supplement this vast array of technical information; they have submitted for review depositions they took of HEW's investigators and policy advisors together with reports and affidavits of health, transportation, economic, demographic and legal experts [88] retained by them to demonstrate "the respects in which the administrative decision . . . failed to consider all relevant factors, lacked an adequate factual basis, and failed to make a rational connection between the facts found and the choices made." [89]

Obviously, this extra-record information was neither considered nor relied upon by the Secretary in reaching his decision. Nor has it been shown that there was an inadequate evidentiary development before the agency which would justify supplementation by affidavits, depositions, or other proof of an explanatory nature. Furthermore, an inquiry into the mental processes of agency decision makers is ordinarily prohibited unless there has been a strong showing of bad faith or improper behavior. *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 420, 91 S.Ct. 814. But here there was no such showing made. Nevertheless, it is suggested that the deposition testimony of these HEW officials and the affidavits and reports of qualified experts are needed for the Court to ascertain if a rational basis exists for the Secretary's decision.

 The existence of a rational basis must be expressed, of course, by the agency itself; it cannot be supplied by the Court or by a co-party. *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). But even a decision of "less than ideal clarity" will be sustainable if the agency's rationale "may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra,* 419 U.S. at 286, 95 S.Ct. 438. *See also Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945). Here, the opinions offered by the plaintiff's experts, and the testimony of HEW officials directly involved in the process that generated the agency record, offer little that is new. In the Court's view, therefore, the plenary review mandated by *Overton Park* must be limited to the administrative record already in existence unless it is shown that that record does not provide an adequate foundation for judicial review. Since no such showing has been made and since in the Court's opinion the full record adequately discloses the factors that were considered and the Secretary's construction of the evidence, the extra-record information proffered by the plaintiffs will not be considered.[90] *Camp v. Pitts, supra,* 411 U.S. at 142–43, 93 S.Ct. 1241. *See also Chrysler Corp. v. Schlesinger,* 565 F.2d 1172, 1191 (C.A. 3, 1977), *cert. granted sub nom. Chrysler Corp. v. Brown,* 435 U.S. 914, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1978); *Independent Meat Packers v. Butz, supra,* 526 F.2d at 238–39; *National Nutritional Foods Ass'n v. FDA,* 491 F.2d 1141 (C.A. 2), *cert. denied,* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); *GTE Sylvania, Inc. v. Consumer Product Safety Comm'n,* 404 F.Supp. 352, 368 (D.Del.1975); 2 K. Davis, *Administrative Law Treatise* § 11.05 (1958).

## III. THE EVIDENCE

Mindful of its role in applying the "arbitrary and capricious" test, the Court now

---

88. Docket Item 218A (Wolfe Report), B (Manheim Report), C (Pollack Affidavit), D (Bayard Affidavit), E (Rose Affidavit); Docket Items 207 (Chachkin Deposition), 221A–C (Redman Deposition), 222 (Middleton Deposition). The Court notes that Docket Items 218G (Wood & Tower Report) and F (Margulies Letter to Rose) are included in the certified administrative record and, therefore, properly may be considered on review.

89. Docket Item 217, Memorandum of Points and Authorities, at 23.

90. Similarly, the Court will not consider the affidavit of James P. Tyler, Director of Finance for the WMC, submitted by WMC in support of its cross-motion for summary judgment. (Docket Item 232).

turns to the record that ostensibly supports the Secretary's decision concerning Plan Omega. Unfortunately, reviewing the administrative record in this case has been an exceedingly arduous task, principally because the record is such an unwieldly, and sometimes redundant, conglomeration of memoranda, statistics, and innumerable reports, studies and hearing transcripts. In addition to its unmanageability, the record is ponderous—exceeding 6,000 pages. Therefore, while the Court has examined the record with great care, it would unnecessarily burden this already lengthy opinion to discuss it all here; rather, the Court shall confine its remarks to those areas of the Secretary's determination that have been singled out for attack.

The plaintiffs' attack is two-pronged. The simplest is the charge that the Secretary failed to consider all the relevant factors before deciding to approve Plan Omega. The second prong, taking another point of reference, is a broad scale assault on the factual sufficiency and the legal validity of particular provisions in the contract of assurances adopted by the Secretary.

## A. Adequacy of the Secretary's Investigation

### 1. The Lack of Expertise.

From the beginning of this lawsuit, the plaintiffs have asserted that HEW lacked the financial and personnel resources necessary to carry out its compliance responsibilities in the health and social services area. Responding to this charge, HEW assured the Court it was prepared to carry out its statutory obligations and proceeded in a timely fashion to investigate and verify the plaintiffs' allegations concerning Plan Omega. Nevertheless, plaintiffs now urge the Court to deem HEW's investigation itself to be arbitrary and capricious because it did not include, or rely upon, qualified professionals trained or experienced in the areas of health, transportation, or economics.

▮▮▮▮ Not surprisingly, the plaintiffs have been able to isolate errors in the record which, arguably, can be attributed to the agency's relative inexperience in performing compliance reviews of proposed hospital relocations. However, as the errors were made known, the agency responded accordingly by altering their review methodology or demonstrating that the error did not affect their calculations in a significant manner. Furthermore, although a greater reliance on experts may have avoided some of the errors identified by the plaintiffs, the important question from the standpoint of a reviewing court is whether the errors themselves are so clear as to deprive the Secretary's decision of a rational basis. *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. 814; *Ethyl Corp. v. EPA, supra,* 541 F.2d at 34–35 & n. 74. The Court has carefully reviewed the evidence of record and the agency's construction of it and, for the reasons discussed in the remainder of this opinion, it cannot find that the Secretary's decision constitutes a clear error of judgment. Nor can this Court find that the inexperience of the agency in the area of hospital relocation compliance reviews, or its failure to retain the number of experts which the plaintiffs might prefer,[91] renders its investigation in this case arbitrary or capricious. *Cf. United States v. Chemical*

---

91. Actually, the record indicates that HEW did consult with Dr. Montague Brown, a health expert, and a number of his associates in the Health Administration Graduate Program at Duke University and with Dr. Steven Lipson of the Department of Community Medicine at Georgetown University. Ad.Rec. Ex. M–10 at M–21 to 28, Ex. ROM–1 at ROM–2 to 13; Investigative Report at 319. Furthermore, the conclusions of various financial, demographic and transportation experts retained by the plaintiffs to conduct independent studies of Plan Omega were considered by HEW officials at various times during their review process. *E. g.,* Ad.Rec. Ex. M–4 at M–13, Ex. C–5, Ex. C–17 at C–144 to 155, Ex. C–24 at C–180 to 199, Ex. C–49 at C–646 to 770.

Finally, it should be noted that OCR's investigative personnel assigned to this case, although not "experts" in health care or economics, are experienced in civil rights investigations, social science research, statistical analysis, and data processing. Docket Item 203, HEW's Answers to Plaintiffs' Fourth Set of Interrogatories, Ans. No. 40 at 29.

*Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926).

### 2. The Failure to Consider Alternatives.

The plaintiffs also argue that the Secretary, having established a *prima facie* Title VI and Section 504 case against WMC, was required to consider whether there were alternative plans WMC could adopt that would have less discriminatory impact than Plan Omega. Thus, in the plaintiffs' view, the administrative investigation was prejudiced in WMC's favor because the Secretary, without an independent analysis, tacitly endorsed Plan Omega as the most plausible and least discriminatory plan available.

 This contention, however, is without merit. The Secretary properly recognized that his regulations call for an "examination of the compliance status of Plan Omega *per se* " and not an inquiry into the Title VI and Section 504 suitability of each of the more than 50 proposals considered and discarded by the hospital.[92] Since the plaintiffs' complaint only alleges that Plan Omega will have a discriminatory impact, the Court cannot fault the Secretary's decision to confine his investigation to that issue.[93] It is true, of course, that once the Secretary found Plan Omega in violation of Title VI and Section 504, the burden shifted to WMC to come forward with evidence justifying its action and demonstrating that no alternative proposals with less discriminatory impact are available. *Cf. International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (Title VII case); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (Title VII case); *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 149 (C.A. 3, 1977), *petition for cert. filed,* 46 U.S.L.W. 3438 (Jan. 17, 1978) (No. 77–966) (Title VIII case); *E.E.O.C. v. E.I. duPont de Nemours & Co.,* 445 F.Supp. 223 (D.Del.1978) (Title VII case). But in this instance WMC did not attempt to meet, let alone overcome, the *prima facie* case against Plan Omega. Instead, it accepted the finding of a violation and agreed to adopt whatever remedial measures the Secretary deemed necessary to eliminate the discriminatory impact. If, on the other hand, WMC had attempted to justify Plan Omega's discriminatory impact by introducing evidence demonstrating that no alternative course of action could be adopted, then the Secretary would, as the plaintiffs suggest, be required to investigate other alternatives to determine whether, in fact, a less discriminatory proposal is available.[94]

---

**92.** Investigative Report at 198–202.

**93.** It is noteworthy that already by 1968 WMC had focused on three kinds of options: (1) it could seek to develop a large hospital facility in the city and establish a smaller one in the county, (2) it could build or establish two hospitals of equal size in both the city and the county, or (3) it could build a large hospital in the county while retaining a smaller one in the city. All three plans thus included the building of a suburban hospital of some magnitude, ranging from a 200 bed community hospital to Plan Omega's 800 bed concept. In the course of his investigation into Plan Omega, the Secretary considered WMC's claims regarding the availability of alternative plans and sites as well as the nature of WMC's reasons for rejecting them. Furthermore, the record indicates that, based on his review, the Secretary believed Plan Omega offered "considerably less risk" of a discriminatory impact than the discarded programs, *provided* certain conditions were accepted and met by WMC. Investigative Report at 198–202, 206.

**94.** Contrary to the plaintiffs, the Court reads *Resident Advisory Board v. Rizzo, supra,* as supporting the Secretary's decision *not* to investigate other proposals. In that case, Judge Garth outlined the parameters of a district court's discretion in determining whether a defendant has carried its burden of rebutting a *prima facie* Title VIII case. Although the defendant there had offered no justification for its discriminatory actions, the Court recognized that if a defendant (in this instance WMC) comes forward with evidence showing that no other alternative course of action can be adopted, the burden shifts to the plaintiff (in this case the Secretary) to demonstrate that other practices are available. 564 F.2d at 149 n. 37. On the other hand, paraphrasing Judge Garth, "[WMC's] failure to offer proof of justification renders fruitless consideration of any other factors . . . in determining whether [the Secretary's *prima facie* case [has] been overcome. . . . If the [Title VI] *prima facie* case is not rebutted, a violation is proved. The question of remedy then remains." *Id.* at 149–50.

Since a violation had been found and since WMC provided a remedy which the Secretary deemed sufficient, the Court cannot find his failure to investigate other plans to be arbitrary and capricious.

### 3. Failure to Consider Existing Discriminatory Practices.

Next, the plaintiffs argue that the Secretary's decision to approve the contract of assurances was arbitrary and capricious because his investigation of Plan Omega failed to evaluate whether WMC's *existing* policies and practices, at least with respect to the services destined under Plan Omega to be located exclusively at Stanton, already have a discriminatory impact. In this regard, they point to information that was before the Secretary indicating the existence of unexplained disparities in the racial configuration for patients presently admitted to several of WMC's service units.[95] Evidence of an existing racial imbalance in certain medical categories, say the plaintiffs, constitutes sufficient notice of a possible failure to comply with the Title VI regulations to prompt an appropriate inquiry and, if a violation were proved, enforcement proceedings. No such inquiry was begun in the context of the Plan Omega investigation, however; nor do the provisions of the contract of assurances address that problem. .

■ The short answer to this argument, however, is that the parameters of the Secretary's investigation in this case were plainly delimited by the plaintiffs' own complaint which challenged the potential disparate effects of Plan Omega rather than present disparate effects caused by WMC's existing admission practices. The Court cannot find, therefore, that any problem regarding the Title VI compliance of WMC's current operations was a relevant factor for the Secretary's consideration in the context of his Plan Omega inquiry.[96]

### 4. The Failure to Consider Plan Omega's Financial Feasibility.

■ Finally, the plaintiffs contend the Secretary's decision is irrational because he failed to consider the financial integrity of Plan Omega. Relying upon a report which indicates the actual cost of Plan Omega will far exceed WMC's original projections,[97] the plaintiffs vehemently insist the plan is a "financial disaster" that eventually will force WMC to curtail many of the free hospital services that largely benefit indigent members of the minority population.

Unlike a problem in calculus, the prediction that Plan Omega will be a "financial disaster"—a judgment involving complicated problems of cost accounting and econom-

---

**95.** Present admission data supplied by WMC in the following medical services show a disproportionately low incidence of minority patients and minority patient days spent in private versus clinical categories:

| | Number of Patients | | | | Number of Days | | | |
|---|---|---|---|---|---|---|---|---|
| | Private | | Service | | Private | | Service | |
| Medical Service | (White) | (Nonwhite) | (White) | (Nonwhite) | (White) | (Nonwhite) | (White) | (Nonwhite) |
| Neurology | 130 | 5 | 0 | 0 | 1291 | 51 | 0 | 0 |
| Cardiovascular (represents discharge data) | 716 | 84 | 37 | 24 | Not Available | | | |
| Nephrology | 62 | 10 | 0 | 0 | 772 | 146 | 0 | 0 |
| Neurosurgery | 268 | 29 | 21 | 11 | 3894 | 185 | 418 | 185 |

**96.** It is clear, however, that the Secretary's regulations require an investigation whenever there is reason to suspect a possible failure to comply with the civil rights laws in question. 45 C.F.R. § 80.7(c). Pursuant to this command, the issue of WMC's *present* compliance has been referred to OCR's regional office for appropriate review. Docket Item 203, HEW's Answers to Plaintiffs' Fourth Set of Interrogatories, Ans. No. 29 at 25.

**97.** Ad.Rec. Ex. R–16 at R 520–56 (Wood & Tower Cost Report For Proposed Construction of Wilmington Medical Center).

ics—cannot now be proved right or wrong. There is credible evidence, however, which strongly suggests that Plan Omega's actual construction costs will exceed by more than 20 million dollars the officially approved budget of 73.5 million dollars (exclusive of renovation expenditures for the Delaware Division).[98] Moreover, the extensive remedial measures which WMC is contractually bound to implement in connection with Plan Omega will likely cause a substantial, and unexpected, increase in its approved budget. After all, even the most conservative estimates indicate the contract's transportation provision alone will add about 100,000 dollars annually to the cost of WMC's existing transportation budget[99]—a significant portion of which probably will not be reimbursed by private or public health insurers.[100] But despite the already serious doubts surrounding the fiscal integrity of Plan Omega, WMC evidently is prepared to invest potentially massive sums of money in order to bring the plan into compliance with the civil rights laws. There is nothing in the record to suggest, for example, that WMC ever objected to the remedial measures required by the Secretary as being too costly or as likely to render Plan Omega fiscally irresponsible. In this light, therefore, the Secretary properly concluded it was unnecessary to probe behind WMC's financial assumptions or to question the wisdom of Plan Omega from a practical or economic standpoint. While the plaintiffs seem to suggest that WMC intends to renege on the remedial measures because of the costs involved, not a shred of evidence has been presented to the Secretary, or to this Court for that matter, which would indicate bad faith on the part of WMC in agreeing to effectuate the modifications required by the contract of assurances. Moreover, the contract specifically provides that a failure by WMC to fully satisfy any of its terms will constitute a *prima facie* violation of Title VI and Section 504 and further will constitute grounds for the termination of federal financial assistance. In light of the unmistakable import of this stringent language and considering WMC's failure to raise the cost factor as a reason for not implementing the contractual assurances, a study of the financial feasibility issue, as the Secretary realized, would have been a fruitless endeavor. And, while this Court may have its own doubts regarding the financial wisdom of Plan Omega, it cannot find the Secretary's failure to independently investigate this factor to be so clearly erroneous as to deprive his final decision of a rationally supportable basis.

### B. Sufficiency of the Contract of Assurances

The Secretary's investigation identified two basic problems which bear most importantly on the question whether Plan Omega comports with the civil rights laws: (1) the extent to which the relocation of hospital services would have a disparate impact upon racial minorities and the handicapped in terms of their access to health care, and (2) the inherent propensity of two or more separate facilities, which render like services, to become racially segregated. Based

---

**98.** *Id.* See also Ad.Rec. Exs. R–8 to 11 at R 323–63. The Wood & Tower report, which includes a cost analysis of Plan Omega and alternative proposals, contains the following observation:

> If the maximum project cost [for Plan Omega] is $75,000,000 and if the number of beds at completion must be in the vicinity of 1,000, the Medical Center's construction program must be modified to incorporate more renovation of existing facilities and much less new construction. Even if only 540 new beds were built, the total project cost would be $70,000,000. This would leave only $5,000,000. for all other necessary renovation to 460 beds [at the Delaware Division]. Although renovation costs are much less per bed, $5,000,000. would not be sufficient for the required renovation. Given this state of affairs, it is recommended that the entire program be reconsidered. It will be too late to do so once construction is begun. Ad.Rec. Ex. R–16 at R 523.

**99.** Docket Item 180, Larson Deposition, Ex. GL–5. As Director of Plant Operations, Mr. Larson manages WMC's existing inter-division transportation system.

**100.** Docket Item 202, HEW's Answers to Plaintiffs' Third Set of Interrogatories, Ans. No. 2 at 2–3.

on certain findings made in connection with these issues, the Secretary demanded a stringent and comprehensive series of assurances, in the form of a contract, which are designed to ameliorate Plan Omega's potential discriminatory effect. The two most controversial provisions of that contract will be discussed first.

### 1. *The Transportation Plan.*

The first factor considered in measuring Plan Omega's impact on the accessibility of health care was the *proximity* of the relocated hospital services to WMC's major patient population center—New Castle County. Although demographic data show a substantial population shift away from the city of Wilmington during the decade from 1960 to 1970, a clear majority of New Castle County's total population still resides nearer to WMC's present urban location than to the proposed Stanton site.[101] Indeed, using the Delaware Division and the proposed Stanton location as focal points, statistics indicate the population density is four times greater in the area within a two and one-half mile radius of the Delaware Division than within the same distance of the proposed Stanton location.[102] Demographic patterns in the county with respect to blacks, the elderly,[103] and the handicapped[104] are even more clearly defined.[105] More than forty times as many black persons, and approximately five times as many elderly persons and handicapped persons, live within a two and one-half mile radius of the Delaware Division as live within that distance of the proposed Southwest Division.[106] Based on the premise that an in-

---

**101.** About 30% of all persons in New Castle County live within two and one-half miles of WMC's present location, while 6% live within a comparable distance of the proposed Stanton location. Investigative Report at 19, 20. Of course, as the distance from the two locations increases, the disparity diminishes. For example, 95% of the county's population resides within ten miles of the Delaware Division as compared to 88% residing within the same distance from the proposed Southwest Division. *Id.* at 70.

**102.** *Id.*

**103.** Because of the recognized relationship, between the aging process and physical disabilities leading to increased hospitalization, the areas of population concentrated by age were calculated to ascertain the potential disadvantages to the elderly posed by the relocation. The elderly were defined as including persons aged 60 and older. Investigative Report at 25–26.

**104.** HEW was unable to obtain data showing the incidence of handicapped persons by zip code; instead, it relied on data which indicate the number of disabled workers receiving social security disability payments for purposes of calculating population concentration by handicap. *Id.* at 31.

**105.** Using either the "concentric circle method" or the "quadrant method," HEW was able to ascertain the distribution of the various social and ethnic populations in question as well as the proximity of those populations to the Delaware Division and to the proposed Southwest Division.

Simply stated, the concentric circle method of analysis entails drawing a series of concentric circles, all the points of which are equidistant from the center, with the focal point being either the Delaware Division or the Southwest Division. Then, using census data, one can determine how many persons live within the radius of a given number of miles of either location. The quadrant method entails dividing New Castle County into four separate quadrants with the City of Wilmington serving as the focal point. The four quadrants, *viz.,* Northwest (Greenville); Northeast (Brandywine); Southwest (Stanton, Middletown, Elsmere); and Southeast (New Castle), are then associated with their appropriate zip code zones. From this, the population of each quadrant is calculated; the difference between the four quadrant population and the total county population is then attributed to Wilmington itself. *See generally* Investigative Report at 12–18.

**106.** The statistics for each group are as follows:

| | Within 2½ miles of Del. Division | Within 2½ miles of S/W Division |
|---|---|---|
| Black persons living in New Castle County | 75.9% | 1.7% |
| Elderly persons living in New Castle County | 43.3% | 6.9% |
| Handicapped persons living in New Castle County | 42.2% | 9.3% |

verse relationship exists between geographic distance and accessibility of services, the Secretary concluded that "the proposed relocation to the Stanton area is a disadvantage to all races, but the greatest impact is on blacks and other minorities because of their large concentrations in areas closest to [WMC's] present location." [107]

Furthermore, factors other than distance which affect accessibility, such as the availability of efficient and economic modes of transportation, reinforce this disproportionate impact.[108] The Secretary found, for example, that nearly 75% of all households in New Castle County without automobiles are located within approximately two miles of the Delaware Division, while only 4.5% of households without automobiles are located within the same vicinity of the proposed Southwest Division.[109] The county's existing and proposed transit services were found either too expensive or speculative to ameliorate the disparate impact that the proposed relocation will have on persons without reliable transportation of their own.[110] While a private hospital is not inherently responsible for meeting the transportation needs of its patients and visitors, the Secretary recognized that "when a hospital which receives federal financial assistance undertakes a voluntary action, such as Plan Omega, which shifts medical facilities and resources to a location relatively inaccessible to identifiable minority groups absent special provision of transportation, the hospital bears some responsibility to take steps adequate at least to maintain the pre-existing level of access for minority groups." [111] Provision of an acceptable plan for sufficient hospital-owned transportation thus became the linchpin of the remedy prescribed to mitigate the accessibility problem.

The transportation plan approved by the Secretary is both far-reaching and flexible. First, WMC is obligated to provide *free* and *adequate* transportation for all patients, visitors and employees between the Delaware and the Southwest Divisions, with a shuttle vehicle "leaving each of the said divisions every fifteen minutes during the period from 5:30 a. m. to 9:45 p. m." on weekdays and "commencing fifteen . . minutes prior to and ending fifteen . . minutes after each period of visiting hours" on weekends.[112] WMC is also required to

| | Within 5 miles of Del. Division | Within 5 miles of S/W Division |
|---|---|---|
| Black persons living in New Castle County | 88.8% | 32.1% |
| Elderly persons living in New Castle County | 77.4% | 54.7% |
| Handicapped persons living in New Castle County | 71.6% | 57.7% |

107. Investigative Report at 25.

108. *Id.* at 208. *See also* Ad.Rec. Ex. ROM–1 at ROM 8.

109. Investigative Report at 34–37. There are 122,971 households in the county of which 16,-423 or about 13% are without automobiles. Even extending the geographic radius to five miles shows that only 36.9% of households without automobiles live within that distance of the Southwest Division, as opposed to 88.5% located within the same distance of the Wilmington facility. *Id.* at 34.

110. Investigative Report at 135–215, 236–307. In measuring the impact of existing modes of transportation on the access problem, the Secretary considered (1) the transportation matrix and (2) the transit services. Based on an analysis of the results of traffic studies conducted by WMC in cooperation with the Delaware Department of Highways and Transportation, the Secretary found that by 1980 traffic congestion on the major alternate routes leading to the Southwest Division will pose a major problem in terms of access to that facility. Compounding the problem is the fact that private and public transit services are "speculative as to their feasibility" and cannot be considered reliable sources for patients, visitors and employees needing transportation services to reach the Delaware or the Southwest Divisions. *Id.* at 136–38, 140–146, 150–54, 209–11.

111. Investigative Report at 210.

112. Docket Item 174, Contract of Assurances ("Contract" ___.) at 2, pars. 1(a) & (b). The contract commands that WMC maintain in operation *at least* (1) four passenger buses with a 20–30 passenger capacity, of which not less than two must be equipped to provide convenient service to the handicapped, (2) three ambulances, and (3) two van-type station wagons equipped to provide convenient service to the

advise its employees that transportation will be provided on demand during hours not specifically established under the contract.[113] Second, in order to "make known publicly the plan of the general transportation system," WMC is required to provide appropriate informational materials [114] for its staff, patients, the local media, governmental and community agencies, and especially for groups representing individuals disadvantaged by race, national origin, age, economics, or otherwise who may have no other available means of transportation between the Delaware Division and the Southwest Division.[115]

The plaintiffs contend the Secretary's decision to approve the transportation plan was arbitrary and capricious (a) because he failed to evaluate the sufficiency or the financial feasibility of the plan, and (b) because the plan places the burden of the remedy upon the very persons whose civil rights the Secretary found will be violated if Plan Omega as originally envisioned is implemented.

In the first place, however, it was unnecessary for the Secretary to consider the financial feasibility of the proposed plan since WMC consented to furnish adequate transportation regardless of its cost.[116] Moreover, if, as the plaintiffs seem to suggest, the transportation plan is unaffordable, then surely responsible officials for WMC would have raised that contention during negotiations with the Secretary, es-pecially since the contract declares that a failure of WMC to provide adequate transportation services within the meaning of the agreement constitutes a *prima facie* violation of Title VI and Section 504 and further constitutes grounds for the suspension of federal assistance.[117]

Second, the *sufficiency* of the proposed plan was in fact given meticulous consideration by the Secretary. Although the precise scope of the potential need for a shuttle service is impossible to predict with mathematical certainty, the Secretary was able through extrapolation to discern the approximate number of persons who each day will need hospital-provided transportation to reach either of WMC's two facilities. Essentially, the Secretary's extrapolation was based on a "worst possible situation" model, *i. e.,* a model premised on the greatest possible patient, employee and visitor use of a hospital-owned shuttle system. Data was first collected to determine the various modes of transportation (*e. g.,* walking, bus, taxi, automobile) presently used by persons traveling to the Wilmington facility.[118] Having ascertained the percentage of patients, visitors and employees who rely on a particular mode of travel, the Secretary then made the following "worst case" assumptions: (1) all persons classified as inpatients would be traveling to Stanton and returning the same day by shuttle; (2) all employees without transportation would be working at Stanton and would require

---

handicapped. *Id.* at 2, par. 1(a)(i)–(iii). Also, WMC is obligated to provide replacement vehicles sufficiently equipped for the handicapped. *Id.* at 3, par. 1(c).

**113.** *Id.* at 2, par. 1(b).

**114.** Information supplied in printed form must be in both English and Spanish languages, as well as in "audible form and such other forms as may be necessary to serve the handicapped." *Id.* at 3–4, par. 2(a).

**115.** *Id.* at 3, pars. 2(a)–(d), at 5, pars. 4(a) & (b).

**116.** Actually, HEW did consider the potential cost of the system and concluded that WMC is capable of financing it. This conclusion, although probably based in part on the fact that WMC already supports a significant inter-divi-sion transit service, is not contradicted by any evidence of record. *See* Investigative Report at 191–93; Letter of Findings at 23.

**117.** Contract, par. 15; Docket Item 203, HEW's Answers to Plaintiffs' Fourth Set of Interrogatories, Ans. No. 10 at 15.

**118.** As one might expect, the Secretary found that the automobile is the generally accepted mode of travel to the urban facility among all persons. Reliance on a bus or taxi is basically restricted to the urban center. The data, however, uniformly show that compared to the general population a greater percentage of minority and elderly patients, visitors and employees travel to the urban hospital as pedestrians or by public modes of transportation. Investigative Report at 282–301.

WMC's shuttle service; (3) all persons who were classified as having "unknown" means of transportation would be going to Stanton by WMC shuttle; (4) all persons in the "walk", "bus", and "taxi" categories would be going to Stanton by WMC shuttle, and (5) all persons who do not own an automobile or who do not have someone in their home who owns an automobile would be going to Stanton by WMC shuttle.[119] The Secretary deliberately ignored the possibility that some of these persons might find alternative modes of public or private transportation because he "preferred to run the risk of overestimation of transportation need rather than underestimation."[120] Based on the above "worst case" assumptions, the Secretary concluded the transportation system set forth in the contract of assurances would be adequate to accommodate the projected need.[121]

The plaintiffs nevertheless insist that the Secretary's calculations are fatally flawed because he ignored certain "peak hours" of transportation demand in computing the number of vehicles which would be needed and because he miscalculated the number of visitors who could be expected to use the shuttle. Having carefully reviewed the record, the Court finds these arguments to be without merit.

The Secretary carefully considered the shuttle's ability to provide adequate service if visiting hours and changing employee shifts coincide to place an unusual burden on the system. In this connection, he was assured by WMC that employee shift changes will not occur during the hours when visitor traffic is greatest.[122] The

plaintiffs' assertion that the Secretary underestimated by more than 100 the total number of daily visitor trips to the Southwest Division is similarly meritless because the record clearly shows this possibility was considered and the shuttle still was deemed adequate to handle the additional passengers.[123] Furthermore, mindful of the complicated nature of the accessibility problem and of the uncertanties encountered in making long range predictions based on inconstant social, economic and demographic factors, the Secretary entered into a contract which defines in broad terms the course WMC is to follow in securing Plan Omega's compliance with the civil rights laws. Since it addresses a problem which is in flux, the transportation provision is purposely written in expansive, normative language designed to make certain that WMC provides sufficient shuttle services to meet any future increase in the number of people requiring transportation to *either* division.[124] The transportation plan is thus intended to satisfy not only the need which the Secretary was able to reasonably predict, but also the unforeseeable need which might arise as a consequence of changes in demographic patterns, socioeconomic conditions, and even energy and environmental factors. There are surely differences of opinion concerning the weight to be given to these factors and their significance in contributing to the need for transportation services in the future. But this significance is for the Secretary to determine; and, though his projections regarding the scope of that need may prove to be erroneous, the contract reasonably compensates for the

119. Docket Item 203, HEW's Answers to Plaintiffs' Fourth Set of Interrogatories, Ans. No. 9 at 14–15.

120. Investigative Report at 238.

121. *See especially id.* at 302–07.

122. Docket Item 203, HEW's Answers to Plaintiffs' Fourth Set of Interrogatories, Ans. No. 9 at 15.

123. Investigative Report at 236–38; Ad.Rec. Ex. M–O at M–2 to 4.

124. The contract requires WMC to submit quarterly reports to OCR indicating the number

of patient, visitor and employee passengers using the shuttle system each day. Contract, par. 9 & Ex. B. If the data prove the transportation system falls below the minimum capacity necessary to ensure the accessibility of all persons to the resources offered at either division, the hospital is then obligated to make an appropriate expansion in the system. This amply protects against the plaintiffs' claim that the plan is insufficient to meet the potential need; if that claim is ultimately proven accurate, OCR's quarterly review will lead to an appropriate modification.

possibility of error by obligating WMC to expand the system in proportion to the demands placed upon it. Therefore, any error the Secretary may have made is not of the egregious type which is within this Court's reach on review.

The plaintiffs' final argument is that the transportation provision itself is legally infirm because it imposes upon members of the protected classes the burden of remedying the discriminatory effect caused by Plan Omega. They assert that since HEW found that blacks, the Spanish-surnamed, the aged and the disabled are concentrated primarily in the city of Wilmington, approval of an extensive shuttle system to transport people between the Stanton Division and the Delaware Division will disproportionately impact upon the abovementioned groups.[125] Consequently, the plaintiffs claim that the Secretary has in effect sanctioned a one-way busing plan which contravenes the principle, established in a long line of school desegregation cases, that an unequal transportation burden must be shown to be justified and necessary for lack of feasible and effective alternatives. *See, e. g., Green v. County School Board of New Kent County, Virginia,* 311 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 16 (1968); *Hart v. Community School Board of Education,* 512 F.2d 37, 53 (C.A. 2, 1975); *Arvizu v. Waco Independent School District,* 475 F.2d 499 (C.A. 5, 1974).

The plaintiffs' claim that the shuttle system will be disproportionately utilized by minorities is probably correct.[126] The record, however, clearly refutes the assertion that the proposed transportation system constitutes a one-way busing plan. The location of exclusive inpatient services at the Delaware Division, together with most of the outpatient clinics and a number of ancillary services, will undoubtedly require use of the shuttle system by suburban residents. To that extent, therefore, the trans-

portation provision offers a two-way rather than a one-way solution.[127]

Furthermore, the school desegregation cases cited by the plaintiffs seem inapt. Those suits were against public school districts that were found to have fostered or permitted a racially segregated dual school system in violation of the Fourteenth Amendment to the Constitution. In order to fashion remedies which distribute equitably the burden of desegregation, federal courts in such cases have required school authorities to demonstrate that plans to bus school children are fair and hold some promise of success. *See, e. g., United States v. Texas Education Agency,* 467 F.2d 848, 885 (C.A. 5, 1972) (en banc) (Bell, J., concurring). Moreover, courts have routinely rejected proposed plans that "place the entire burden of the remedy on those whose rights have been violated." *Evans v. Buchanan,* 435 F.Supp. 832, 840 (D.Del. 1977).

The factual and legal setting of this case, however, is far different than those decisions. In this suit, the plaintiffs have challenged the decision of a private hospital to relocate a portion of its services, alleging that such a relocation will amount to a violation of their rights under Title VI and Section 504. HEW, the agency charged with the duty of enforcing those statutes, has reviewed and evaluated the proposed relocation and, after finding that it posed a risk of discriminating on the basis of race and handicap, selected a remedy designed to bring it into compliance with the statutes. HEW was not faced, however, with a public activity or institution whose facilities were characterized by deeply ingrained segregation; instead, its compliance review merely *projected* the likelihood of the potential discriminatory effect caused by a removal of health care resources to a suburban site. Although it found that the relocation will, in terms of accessibility, likely be a disad-

---

125. *See* Letter of Findings at 8–9.

126. *See* Investigative Report at 282–86.

127. *Id.* at 239–40, 334. At one point, the plaintiffs evidently concede that at least two-thirds

of the shuttle riders will be white persons traveling between the two divisions. Docket Item 217, Plaintiffs' Memorandum of Points and Authorities at 42.

vantage to all races, HEW concluded that an adequate hospital-provided transportation system will mitigate this adverse effect. In combination with other remedial measures, moreover, HEW further found that the transportation plan would probably succeed in eliminating Plan Omega's potential discriminatory impact. Unlike the school cases, the burden associated with WMC's transportation plan will not be imposed upon the protected classes alone; it will be a burden shared by all persons in need of the services to be located exclusively at the Delaware Division or at the Southwest Division. Nor will that burden have the effect of "excluding individuals from, denying them the benefits of, or subjecting them to discrimination" under federally assisted programs in violation of Title VI or Section 504. For all these reasons, therefore, the Court cannot find that the Secretary abused his discretion in deciding to approve the transportation provision of the contract of assurances.

### 2. Patient Utilization Control Provision.

The Secretary recognized that discrimination can be caused not only by a lack of access to medical resources moved to another location, but also by the segregative effect that sometimes results from the operation of two or more separate facilities which offer like services. The plaintiffs vigorously insist that Plan Omega's concept of dual facilities with a wide range of duplicated services, i. e., services available at both locations, will inevitably lead to a segregated hospital system.

Accordingly, OCR set out to evaluate the validity of this claim by projecting the future racial configuration among inpatients admitted to the Delaware Division and to the proposed Southwest Division. In order to construct a "patient profile model," therefore, data was collected on inpatient admissions, classified by race, age, and residence by zip code, from December 1, 1976 through February 1977 at WMC's existing urban locations. After further dividing the data into medical categories and subcategories, OCR assigned patients according to the service they received to the proposed location for that service under Plan Omega. The resulting profile, which was based on the assumption that *all* patients admitted for a service which was offered "primarily" [128] at a particular site will receive services at that primary site, initially showed the following configuration by race:

Inpatient Service by Race—Stanton Location

| RACE | No. | Percent |
|------|-----|---------|
| BLACK | 911 | 16.5 |
| PUERTO RICAN | 79 | 1.4 |
| WHITE | 4419 | 80.0 |
| OTHER | 55 | 1.0 |
| UNKNOWN | 58 | 1.1 |
| TOTAL | 5522 | 100.0 |

Inpatient Service by Race—Delaware Location

| RACE | No. | Percent |
|------|-----|---------|
| BLACK | 740 | 16.1 |
| PUERTO RICAN | 43 | 1.0 |
| WHITE | 3668 | 79.6 |
| OTHER | 44 | 1.0 |
| UNKNOWN | 111 | 2.4 |
| TOTAL | 4606 | 100.0 |

The patient configurations depicted by this model thus show no potential disparity in the percentage of minorities receiving services at either of the two sites envisioned by Plan Omega. Next, OCR projected the distribution of patients by race for each of the major in-service medical departments originally identified for the Delaware location and a similar projected distribution for the primary departments planned for the Stanton location. The resulting patient profile is as follows:

---

128. WMC defined "primarily" as referring to those services which have their headquarters at a particular location, but patients can be admitted to either location. Investigative Report at

322. OCR concludes that primary services should be considered in the category of "physician option" because the support services are available for all services at either location. *Id.*

### Inpatient Analysis by Department & Race—Stanton Location

| DEPARTMENT | BLACK | | PUERTO R. | | WHITE | | OTHER | | UNKNOWN | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % |
| Obstetrics | 263 | 28.9 | 25 | 31.0 | 1061 | 24.0 | 17 | 30.9 | 5 | 8.6 |
| Newborn Nurs. | 220 | 24.2 | 24 | 30.4 | 979 | 22.2 | 22 | 40.0 | 2 | 3.4 |
| Premature | 14 | 1.5 | 1 | 1.3 | 18 | .4 | 0 | 0 | 0 | 0 |
| Gynecology | 146 | 16.0 | 8 | 10.1 | 558 | 12.6 | 4 | 7.3 | 10 | 18.2 |
| Orthopedics | 46 | 5.1 | 4 | 5.0 | 327 | 7.4 | 1 | 1.9 | 10 | 18.2 |
| Neuro-Surg. | 37 | 4.1 | 3 | 3.8 | 260 | 5.9 | 5 | 9.1 | 12 | 20.7 |
| Oncology | 30 | 3.3 | 0 | 0 | 170 | 3.9 | 2 | 3.6 | 3 | 5.8 |
| All Other | 155 | 17.0 | 14 | 17.7 | 1046 | 23.7 | 4 | 1.3 | 16 | 27.6 |
| TOTAL | 911 | 100% | 79 | 100% | 4419 | 100% | 55 | 100% | 58· | 100% |

### Inpatient Analysis by Department & Race—Delaware Division

| DEPARTMENT | BLACK | | PUERTO R. | | WHITE | | OTHER | | UNKNOWN | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % |
| General Med. | 480 | 64.49 | 33 | 76.7 | 1981 | 54.0 | 25 | 56.8 | 72 | 64.9 |
| Psychiatry | 26 | 3.5 | 2 | 4.7 | 138 | 3.8 | 3 | 6.8 | 15 | 13.5 |
| Dental | 29 | 3.9 | 0 | 0 | 158 | 4.3 | 1 | 2.3 | 0 | 0 |
| General Surg. | 148 | 20.0 | 3 | 6.9 | 877 | 23.9 | 12 | 27.3 | 23 | 18.9 |
| Ophthalmology | 17 | 2.3 | 1 | 2.3 | 161 | 4.4 | 0 | 0 | 1 | 9.0 |
| Otology | – | – | – | -- | – | – | – | – | – | – |
| Rhinolaryn | 40 | 5.4 | 4 | 9.3 | 353 | 9.6 | 3 | 6.8 | 0 | 0 |
| TOTAL | 740 | 100% | 43 | 100% | 3668 | 100% | 44 | 100% | 111 | 100% |

The above distribution pattern, however, depended heavily on OCR's assumption that patients would utilize the two facilities without regard to race and that, unless medical reasons dictated otherwise, physicians would choose the location *nearest* to the patient's residence in making assignments to a facility for duplicated services. Nevertheless, the data clearly demonstrated the importance of certain services slated to be located exclusively at each division. Obstetrics, newborn and premature nursery, and gynecology, four services to be available only at the Stanton site, comprise 70.6 percent of all black patients projected for Stanton on the basis of OCR's model. Similarly, the location of psychiatry, ophthalmology, rhinolaryngology, family practice and dentistry exclusively at the Delaware Division assure its integration. But in spite of the "magnet" effect of these exclusively located departments, OCR recognized that the duplication of general medicine (including its cardiology component) and general surgery departments could distort the distribution under its original patient profile model.[129] This is because those two departments comprise the greatest number [130] of patient admissions and therefore would present considerable opportunity for patient and physician option to gradually cause an increased minority profile at the Delaware Division and concomitant decreased minority profile at the proposed Southwest Division. To account for this possible adverse effect on its model, OCR altered its original projections by assuming (1) that one-half of

129. Plan Omega calls for the following allocation of beds for duplicated services between the two divisions:

| General Medicine | Delaware Division | Southwest Division |
|---|---|---|
| Medicine | 68 | 226 |
| ICU/CCU | 33 | 44 |
| Surgery | | |
| General Surgery | 70 | 175 |
| Surgery ICU | 18 | 18 |

Docket Item 185, WMC's Answers to Plaintiffs' Sixth Set of Interrogatories, Ans. No. 2 & 3, at 5–8.

130. General medicine and surgery account for 77.9 percent of all white patients projected to receive inpatient services at the Delaware Division under Plan Omega. Investigative Report at 53.

the white general medicine and general surgery patients who reside nearer to the Delaware Division will nonetheless be admitted to Stanton, (2) that all minority patients earlier projected as going to Stanton, except for the four services exclusively located there, instead will go to Delaware, and (3) that all the rehabilitation patients (all but one of whom were white) presently confined in the Eugene duPont Memorial Division are subtracted from the Delaware Division count. The resultant racial configuration would be 12 percent black at the Southwest Division and 30 percent black at the Delaware Division.[131] Although this disparity in patient distribution at the two divisions will not render the Delaware Division a predominantly black facility, it "clearly demonstrates a wide variance between the two divisions insofar as utilization by blacks is concerned." [132]

OCR made similar patient profile projections for outpatient clinics and ancillary services for non-clinic outpatients. Under Plan Omega, almost all of the outpatient clinics will be located exclusively at the Delaware Division. OCR found that more than 60 percent of patient visits to these clinics are made by minority (black and Puerto Rican) patients. As a result, the location of those clinics "insures a significant additional minority presence" at the Delaware Division and represents another factor contributing to the potential racial identifiability of the urban hospital.[133]

Five ancillary services will be located exclusively at the Delaware Division, ten exclusively at the Stanton location and 25 will be duplicated. Based on the 15 exclusively-located services, OCR projected that blacks would account for only 12 percent of the visits to the Stanton Division as compared with 35 percent of the visits to the Delaware Division.[134] Moreover, since the majority of ancillary services will be duplicated, OCR concluded that this disparity may worsen as a result of the numerous factors which could influence physician assignment and patient choice.

As one would expect, emergency services will be available at both divisions under Plan Omega. In this regard, OCR projected that based upon current admission patterns, black patients will constitute 80 percent of all visits to the emergency room at the Delaware Division and only 18 percent of the visits to the Southwest Division.[135] However, since duplication of emergency services is deemed medically necessary, OCR concluded that the extent to which the duplication contributes to the overall racial identifiability of the Delaware Division is unavoidable.[136]

Projections of the racial configuration among patients at the two divisions, however, were concededly imprecise. OCR recognized, for instance, that the "physician option" mode of admission offers opportunity for choices which could result in the segregated delivery of duplicated hospital services—particularly general surgery and general medicine—including the great majority of the services to be offered at the Delaware Division. But the "physician option" problem is a complex one which may be influenced by the location of the physician's office, the patient's residence, the

---

131. Investigative Report at 320; Letter of Findings at 18. OCR also noted that this projection yielded a distribution of 7488 patients at the Southwest Division and 2495 patients at the Delaware Division which is more compatible with the 800/250 bed distribution than is the 5522/4606 patient distribution projected under OCR's original assumptions. Letter of Findings at 18.

132. Letter of Findings at 18.

133. Id. at 18–19.

134. Investigative Report at 100–12, 114. Although twice as many ancillary services will be located exclusively at Stanton than Delaware, OCR found a relatively low incidence of black utilization of those particular services. Consequently, the minority presence is significantly diminished at the Stanton Division in terms of exclusive ancillary services. Id. at 106.

135. Id. at 116–19.

136. Id.; Letter of Findings at 20.

preference or convenience of both physician and patient, the assessed degree of medical risk for the patient, and bed availability. There is no easy way, therefore, to precisely measure the impact this particular factor will have on the question of racial identifiability. OCR also considered the potential influence that "patient preference" may have upon the racial configuration of the two divisions. Objectively, there appeared to be no substantive difference in the quality of services currently projected at the two locations. However, based on the experience of other communities, OCR believed it was reasonable to assume that many patients will "equate newness with quality" and will therefore perceive the Southwest Division as a superior facility. Still other white patients can be expected to avoid the Delaware Division because of the perceived racial composition of that division or of the city itself. Finally, OCR recognized that white patients from the northern regions of the state, which it projected will be admitted to the Delaware Division because of its proximity, are relatively "more affluent, have more automobiles, and hence, are more mobile than the minority population. Whites in the northwest quadrant (Greenville) and the northeast quadrant (Brandywine) would therefore experience comparatively little difficulty in going to the Southwest Division, particularly in view of their accessibility to I–95, while blacks in the city, many of whom would be without their own transportation to the Southwest, might well opt for the Delaware Division." [137]

Therefore, even though certain "magnet" services located at the Delaware Division and at the Southwest Division will prevent either division from becoming an all white or all black facility, OCR concluded that the combination of duplicated services (including ancillary and clinical services), the physician option mode of patient admission, the region's demographic patterns, patient mobility, and economic and psychological factors, could well produce an urban facility that has a disproportionately high minority presence.

Accordingly, the Secretary required WMC to adopt a detailed plan of administration, operation and management of the Delaware Division and the proposed Southwest Division designed to eliminate or significantly reduce the potential for racially differentiated utilization patterns between the facilities "as a result of patient choice or physician option." [138] The plan which WMC agreed to adopt, labeled the inpatient utilization control provision, represents perhaps the most controversial aspect of the contract of assurances. This provision of the contract amends WMC's internal admissions and bed assignments policy. In essence, WMC's existing bed assignment and patient admissions policy instructs its central admitting office to determine the assignment of patients to beds at the two divisions based on (1) the condition and medical needs of the patient, (2) the age of the patient (adult versus child),[139] (3) the sex of the patient and (4) the availability of the type of bed needed.[140] The contract of assurances, however, amends this practice by obligating WMC to adopt a policy and inform its Medical-Dental staff that where *duplication* of inpatient services and outpatient ancillary services exists, patients should be instructed to use the facility closest to their home or place of work whenever possible. The contract also specifies those zip code areas which are nearest to the Delaware Division and to the Southwest Division,[141] thus, a patient residing in zip

137. Letter of Findings at 16–17.

138. Contract at 6, par. 6(a).

139. Children and adolescents will be admitted to the pediatric unit located at the Southwest site whether or not they are to be classified as general medical or surgical care patients. Admissions of persons of this age group to the facility which houses the specialties and subspecialties peculiar to that age group is consistent with the concept of locating general services close to related specialties at the level of tertiary care capability. Investigative Report at 317; Letter of Findings at 17–18.

140. Contract, Ex. A at 2–3.

141. Patients residing in zip codes 19703, 19710, 19732, 19801, 19802, 19803, 19805, 19806, 19809, 19810, 19899 and 19807 will be offered a

code zone 19732 who seeks admission to the cardiology department will be offered admission to the Delaware Division, while a similar patient residing in zip code zone 19713 will be offered admission to the Southwest Division. A patient nonetheless may refuse a bed at the nearest location and request assignment to the other facility, depending on the availability of a bed in the department to which he seeks admission. Similarly, although members of WMC's Medical-Dental staff are to be instructed that in the case of duplicated services they should admit their patients to the facility closest to the patient's residence, a physician may elect to admit a patient for duplicated services on a basis other than proximity to a particular facility. With respect to specific services located exclusively at one facility, WMC's admitting policy will admit a patient to that particular division, unless the patient is admitted through one or the other emergency rooms, in which case the patient will be transferred to the proper division as soon as his condition permits.

If patients or physicians violate the principle of assignment to the closest location, that fact will be quickly detected by OCR because the contract obligates WMC to maintain and submit to OCR a "discrete quarterly record of those instances in which a patient's admission fails to correspond to the zip code arrangement" set forth in the contract.[142] In addition, WMC must prepare quarterly reports depicting inpatient utilization by race and ethnicity of the two divisions and indicating *inter alia,* the type of patient (inpatient, clinic, emergency room), residence by zip code, and mode of payment. If these reports indicate a trend toward a "racially identifiable condition"—which is defined as more than 25 percent

minority inpatient utilization[143]—at the Delaware Division, WMC has 180 days in which to

"remedy said racial identifiability by whatever means necessary. Failure to remedy such racial identifiability within said 180 days shall be deemed to be a *prima facie* violation of Title VI of the Civil Rights Act of 1964. HEW will then reopen the administrative proceedings in order to secure compliance with applicable laws."[144]

In this connection, the contract describes three types of corrective measures which may be appropriate to reverse a trend toward a racially identifiable condition at the Delaware Division. First, WMC shall consider the advantages of shifting services between divisions "with particular emphasis on moving from the Southwest Division to the Delaware Division a service which is *least utilized* by patients of the race by which the Delaware Division threatens to become identified."[145] Second, WMC is required to review admissions by members of its Medical-Dental staff, as well as by individual private physicians, to determine whether such physicians or members of the staff should be counseled concerning any discriminatory admission patterns. WMC also must review admissions through the emergency rooms of the two divisions and any subsequent transfer regarding such admissions to determine whether counseling with individual members of the medical staff is necessary.[146] Third, WMC must review and compare admissions by zip code against the data used by OCR in designing a patient profile model to ascertain whether changes in utilization patterns are contributing to a racially identifiable condition at the Delaware Division. If such changes are occurring, WMC is required to consider the

---

bed at the Delaware Division; those patients residing in all other zip codes will be offered a bed at the Southwest Division. *Id.* at 7, par. 6(c). Emergency patients transported by ambulance must be admitted to the emergency facility "nearest to the point of origin of such transportation," *id.* at 6, par. 5, and WMC is required to instruct in writing all ambulance services of this policy. *Id.*

142. Contract at 7–8, par. 6(c).

143. *Id.* at 10, par. 6(h).

144. *Id.* at 9–10, par. 6(g).

145. *Id.* at 8, par. 6(e)(i) (emphasis added).

146. *Id.* at 9, pars. 6(e)(ii)–(iv).

desirability of adjusting the zip code designation used to identify the division closest to a patient's place of residence.[147] Although these specific measures are set forth in the contract, it is clear that WMC is unconditionally obligated to eliminate within 180 days any trend toward a racially identifiable Delaware Division *by whatever means necessary.*

The plaintiffs have leveled three sweeping criticisms at the inpatient utilization control provisions of the contract. First, they point out that the zip codes which the contract designates as closest to the urban location comprise more than 80 percent of New Castle County's minority population. Consequently, they argue that the contract actually ensures that the assignment of patients by zip code to the duplicated services nearest them will result in "grossly disparate" minority utilization patterns at the Delaware Division. The administrative record, however, clearly discredits this assertion. Using the 90 day data base, OCR extrapolated the patient distribution profile by race and ethnicity for each division for duplicated and for exclusive services, with patients identified for duplicated services assigned according to their residence by zip code as designated in the contract of assurances. This model of distribution yields the following patient day profile for each location:

### DELAWARE DIVISION

| % Black | Category | Black | White | P.R. | Other | Unknown | Total |
|---|---|---|---|---|---|---|---|
| 7.4% | Family Practice | 392 | 4763 | 16 | 15 | 121 | 5307 |
| 12.7 | Psychiatry | 181 | 1170 | 4 | 18 | 53 | 1426 |
| 20.7 | Dentistry | 95 | 363 | 0 | 2 | 0 | 460 |
| 11.5 | Ophthalmology | 61 | 433 | 32 | 0 | 5 | 531 |
| | Medical | | | | | | |
| 30.0% | Gen. Medicine | 2611 | 5570 | 38 | 21 | 447 | 8687 |
| 23.8 | Allergy | 335 | 1061 | 10 | 0 | 0 | 1406 |
| | Cardio/See Gen. Med. | | | | | | |
| 0.0 | Dermatology | 0 | 0 | 4 | 0 | 0 | 4 |
| 20.9 | Hematology | 9 | 34 | 0 | 0 | 0 | 43 |
| 0.0 | Endocrinology | 0 | 0 | 0 | 0 | 0 | 0 |
| 29.1% | Medical Sub-Total | 2955 | 6665 | 52 | 21 | 447 | 10140 |
| | Surgical | | | | | | |
| 24.6% | Gen. Surgery | 963 | 2817 | 13 | 28 | 94 | 3915 |
| 8.5 | Proctology | 34 | 364 | 1 | 0 | 0 | 399 |
| 0 | Otology | 0 | 0 | 0 | 0 | 0 | 0 |
| 9.7 | Rhinolaryngology | 56 | 521 | 0 | 2 | 0 | 579 |
| 0 | Vascular | 0 | 0 | 0 | 0 | 0 | 0 |
| 21. % | Surg. Sub-Total | 1053 | 3702 | 14 | 30 | 94 | 4893 |
| 20.8% | Total Patient Days Delaware Div. | 4737 | 17096 | 118 | 86 | 720 | 22757 |
| | % by Race | 20.8% | 75.1% | 0.5% | 0.4% | 3.2% | 100% |

### STANTON DIVISION

| % Black | Category | Black | White | P.R. | Other | Unknown | Total |
|---|---|---|---|---|---|---|---|
| 32.2% | Radiation Therapy | 415 | 872 | 0 | 0 | 0 | 1290 |
| 10.4 | Urology | 204 | 1730 | 11 | 2 | 24 | 1971 |
| 20.7 | Obstetrics | 1028 | 3767 | 104 | 63 | 9 | 4971 |
| 19.6 | Gynecology | 641 | 2546 | 22 | 17 | 45 | 3271 |
| 25.7 | Pediatrics | 1437 | 3631 | 212 | 139 | 281 | 5700 |
| 18.6 | Newborn | 919 | 3718 | 197 | 75 | 34 | 4043 |
| 38.4 | Premature Nurs. | 266 | 375 | 52 | 0 | 0 | 693 |
| 21.5% | Sub-Total | 4910 | 16639 | 598 | 296 | 396 | 22839 |

147. *Id.* par. 6(e)(v).

| % Black | Category | Black | White | P.R. | Other | Unknown | Total |
|---|---|---|---|---|---|---|---|
| | Medical | | | | | | |
| 6.7% | Allergy | 60 | 820 | 7 | 0 | 10 | 897 |
| 9.3 | Gen. Medicine | 757 | 6892 | 15 | 45 | 393 | 8104 |
| 0 | Dermatology | 0 | 51 | 0 | 0 | 0 | 51 |
| 0 | Endocrinology | 0 | 0 | 0 | 0 | 0 | 0 |
| 7.0 | Gastroenterology | 61 | 800 | 6 | 4 | 0 | 871 |
| 17.9 | Nephrology | 138 | 600 | 8 | 0 | 26 | 772 |
| 8.9 | Hematology | 18 | 185 | 0 | 0 | 0 | 203 |
| 4.0 | Neurology | 51 | 1187 | 0 | 0 | 53 | 1291 |
| 17.6 | Oncology | 697 | 3191 | 0 | 22 | 43 | 3953 |
| 11.0% | Medical Sub-Total | 1782 | 13726 | 38 | 71 | 525 | 16142 |
| | Surgical | | | | | | |
| 6.7% | General Surgery | 309 | 3975 | 2 | 30 | 297 | 4613 |
| 15.8 | Neurosurgery | 682 | 3224 | 67 | 49 | 290 | 4312 |
| 14.5 | Orthopedic | 666 | 3730 | 37 | 1 | 148 | 4582 |
| 20.1 | Plastic | 256 | 943 | 5 | 2 | 15 | 1221 |
| 2.2 | Proctology | 9 | 394 | 0 | 0 | 0 | 403 |
| 12.2 | Thoracic | 151 | 1009 | 58 | 0 | 14 | 1232 |
| 0 | Otology | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Vascular | 0 | 5 | 0 | 0 | 0 | 5 |
| 12.7% | Surgical Sub-Total | 2073 | 13280 | 169 | 82 | 764 | 16368 |
| 15.8% | Total Patient Days Southwest Div. | 8765 | 43645 | 805 | 449 | 1185 | 55349 |
| | % by Race | 15.8% | 78.9% | 1.5% | 0.8% | 3.0% | 100% |

For all services, the Delaware Division would be 21.7 percent minority; the Stanton Division would be 18.1 percent minority. Still, the plaintiffs point to the fact that even under this model, the largest duplicated services, general medicine and general surgery, would include 30 percent and 24.6 percent respectively of black patients alone at the Delaware Division, for a combined distribution of approximately 27 percent—a figure that clearly exceeds the level for racial identifiability set by the contract. For basically two reasons, however, OCR found that the *aggregate* distribution profile is the more accurate indicator of whether a trend toward racial identifiability is occurring at the Delaware Division. First, it recognized that hospital beds are not "grouped" according to medical category; patients assigned to general medicine will not be segregated in one wing or ward of the hospital. Therefore, focusing on the racial profile of a specific duplicated service could unnecessarily bias the distribution model. Second, determining the racial profile of each medical category based on the number of hospital beds it comprises is misleading since standard hospital practices dictate that beds be fungible, *i. e.,* if all general surgery beds are filled, patients in that category may be assigned to a general medicine bed. In other words, the racial configuration of a specific service may be influenced by patients from a different service who are temporarily assigned there because of a scarcity of available beds. OCR reasonably concluded, therefore, that WMC's ability to transfer or reassign patients within different bed categories should not be restricted by establishing an arbitrary minority quota for each medical category or subcategory. Since this conclusion is amply supported by the agency record, the Court cannot find the decision to assign patients by the designated zip codes to have been arbitrary and capricious. This result is reinforced by the fact that the contract specifically obligates WMC to consider the desirability of changing the con-

tractual designation of zip code zones closest to the Delaware Division if the quarterly reports indicate a trend toward a racially identifiable condition at that division. If the plaintiffs are correct that the zip code zones selected by OCR will lead to a disproportionate concentration of minority patients at the Delaware Division, the contract amply protects their rights by requiring WMC to institute appropriate corrective measures—including changing the designation of zip code zones nearest the Delaware Division—to reverse any concentration within 180 days.

Second, the plaintiffs contend that the assignment policy adopted by the contract will over-occupy the Delaware Division. That is, if all persons accepted the hospital's offer of a bed at the facility nearest their residence pursuant to the contractually designated zip code zones, the number of patients assigned to the Delaware Division will exceed the number of available beds. As a result, the plaintiffs predict that the more affluent white patients, rather than wait for a bed, will choose to go to the Southwest Division, leaving the less mobile minority patients concentrated at the urban facility. HEW concedes there is a risk, as the plaintiffs suggest, that the occupancy rate at the urban facility may exceed 100 percent under the assignment system established by the contract and that there may be a surplus of approximately 170 beds at the proposed Southwest Division.[148] The imbalance is evidently attributable to the family practice and general medical services component of the Delaware Division, with each of these categories being oversubscribed based on the 90-day data collection base.[149] Responding to the plaintiffs' argument, OCR has suggested that "the best solution for adjustment of the 100 percent occupancy prospective at Delaware Division, while retaining acceptable racial proportions would be the transfer from Delaware Division of one or more sub-programs under general medicine . . . to bring the general medicine component at Delaware Division into line." [150] In this regard, HEW has requested WMC to submit inpatient data by race, zip code and physician assignment corresponding to the general medicine and general surgery categories, and further divided into subcategories of speciality, so that appropriate subcategories of these major components may be transferred to the Southwest Division.[151] This measure is intended to supplement the other remedies provided in the contract, such as reassignment of zip code zones. Finally, if the contract results in an over-occupancy that causes patients to choose or be reassigned to the Southwest Division, WMC is nonetheless obligated to ensure that such transfers and reassignments are racially neutral and that no trend toward racial identifiability develops at the Delaware Division. In this light, therefore, the plaintiffs' objection to the potential over-occupancy risk is without merit.

The plaintiffs' final, and principal, attack on the inpatient utilization control provision is that it establishes a "freedom of choice" plan of patient admission by which a physician or a patient may, for non-health related reasons, choose a facility other than the one closest to his residence for duplicated services.[152] They contend the Secretary abused his discretion in approving such a plan in the face of the consistent rejection of "free choice" remedies in the context of school desegregation cases. *See, e. g., Green v. County School Board of New Kent County, Virginia,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Morgan v.*

---

**148.** *See* HEW's Answers to Plaintiffs' Fourth Set of Interrogatories Ans. Nos. 1–6; Ad.Rec. Ex. M–O at M–5.

**149.** Investigative Report at 333–40.

**150.** *Id.* at 335–36.

**151.** *See* Docket Item 226, Ex. A (Dodds letter to Layton).

**152.** There will be occasions, of course, when a patient will be assigned for a duplicated service to a facility other than the one closest to his residence because, in the judgment of his physician, the patient may later require the special tertiary care exclusively available at that division.

*Kerrigan,* 530 F.2d 401 (C.A. 1), *cert. denied sub nom. Doherty v. Morgan,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976); *Kelly v. Guinn,* 456 F.2d 100 (C.A. 9), *cert. denied,* 413 U.S. 919, 93 S.Ct. 3408, 37 L.Ed.2d 1041 (1972). Implicit in this argument, of course, is the view that a nonmandatory assignment plan will lead to segregated facilities because patients and physicians will consistently violate the nearest location rule, *i. e.,* the affluent and more mobile white patients will choose the Southwest facility, while less mobile minorities, the aged and the handicapped are relegated to the urban location.

In the Court's view, however, the plaintiffs' reliance upon the school desegregation decisions is misplaced. As noted earlier, those cases typically involved existing and deeply entrenched segregated dual educational systems found to be in contravention of the equal protection clause of the Fourteenth Amendment to the Constitution. A constitutional violation having been established, the courts properly called upon state authorities to come forward with a plan to eliminate the vestiges of state-imposed segregation. Moreover, because freedom of choice plans to desegregate schools have had a long history of failure to eliminate school segregation, state authorities have been required to show that such plans promise to be as effective in achieving an integrated system as any alternative plan. In stark contrast, this case involves a *prediction* that a planned relocation of private hospital services will violate the statutory rights of the plaintiffs and the class they represent. This is not to say that the plaintiffs' rights under Title VI and Section 504 are any less deserving of protection or that Congress did not intend by those statutes to ban wrongs that result from the denial of the equal protection of the laws.[153] *Taylor v. Cohen,* 405 F.2d 277, 281 (C.A. 4, 1968) (en banc). But it must be emphasized that in this case HEW was not confronted with an existing or deeply entrenched segregated

dual hospital system; nor was there a well-documented history of the failure of voluntary patient assignment plans to constrain the emergence of segregatory patient admission patterns. Furthermore, the freedom of choice plans in the school desegregation cases ordinarily were rejected because they proved to be ineffective after a short trial period or because they were proposed as the *exclusive* remedy and thus offered no real promise of achieving an integrated school system. *See, e. g., Morgan v. Kerrigan, supra,* 530 F.2d at 409–10; *Kelly v. Guinn, supra,* 456 F.2d at 108. The patient choice/physician option mode of admission approved in this case has yet to be tested. Moreover, it represents a "biased" or "weighted" mode of admission in the sense that a patient first must be offered admission to the nearest location. It is also buttressed by the substantial corrective measures which must be implemented to reverse, within six months, a racially disproportionate delivery of duplicated services. This may entail redesignating zip code zones, moving services between divisions, and counseling members of the Medical-Dental staff regarding admission practices. The point to be made is that HEW did not leave to chance the success or failure of the voluntary admission policy approved in the contract. Freedom of choice plans in the school context are also struck down because they rest upon the theory that the school district's entire obligation is merely to refrain from excluding any student from any school because of race. *Kelly v. Guinn, supra,* 456 F.2d at 108. Such plans operate "simply to burden children and their parents with a responsibility which *Brown II* [*Brown v. Bd. of Ed. of Topeka,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)] placed squarely on the School Board." *Green v. County School Board, supra,* 391 U.S. at 441–42, 88 S.Ct. at 1696. In this case, however, the nonmandatory patient assignment mode of admission is not an attempt to shift responsibility for assuring

---

**153.** The sponsors of the Civil Rights Act of 1964 represented that Title VI is "simply designed to insure that Federal funds are spent in accordance with the Constitution. . . ."

110 Cong.Rec. 6544 (1964) (remarks of Senator Humphrey). *See also id.* at 7057, 7062, 13333 (remarks of Senators Ribicoff and Pastore).

desegregated health services from WMC, where it properly lies, to patients or private physicians. Indeed, it is unlikely that patients or their physicians will be willing or able to carry that burden. But there is no requirement that they do so. The contract does not require WMC merely to be neutral in its admissions policy; it is obligated to offer every patient admission to the hospital facility which is closest to their residence. More importantly, however, WMC is charged with the affirmative duty to eliminate, by whatever means necessary, and within six months, the segregated delivery of duplicated hospital services, should that condition develop at either division under Plan Omega. It seems clear, therefore, that the Secretary cannot be faulted for having approved a contract which permits a free choice mode of admission when other provisions of that contract expressly mandate that WMC eliminate any segregative effect that that "free choice" may possibly generate.

### 3. Preserving the Viability of the Delaware Division.

From the outset of this litigation the plaintiffs have consistently maintained that Plan Omega will mean an eventual deterioration in the quality of care at the Delaware Division. In their view, the bulk of WMC's financial resources will be devoted to maintaining the Southwest Division as its base hospital, while the Delaware Division is reduced to the status of a "poor stepchild" which functions as the indigent care facility for the state. Inevitably, say the plaintiffs, WMC will move to close down its urban facility and complete the process of relocating all its services to the suburban location.

The Secretary found no evidence which lends credence to the view that WMC intends to abandon its inner-city location once the Southwest Division is in operation. Nevertheless, he apparently was concerned about the possibility that the bulk of WMC's financial resources and the most experienced members of its staff would be assigned to the Southwest Division, while the Delaware Division would be treated as a separate, and subordinate, satellite facility serving primarily as the state's indigent care center.

In this regard, therefore, the Secretary sought and obtained various assurances from WMC designed to guarantee the continued viability of the Delaware Division. The basic theme of these assurances is the maintenance of the Delaware Division as a co-equal, integrated component of a multi-unit health care system.[154]

First, WMC assured the Secretary that it would operate the Delaware and Southwest Divisions on a unitary basis. For instance, WMC agreed to (1) prepare its operating and capital budgets for both divisions for review as a single budget, (2) cause its financial statements to reflect the activities of WMC as a whole, (3) maintain a single Medical-Dental staff with a single director for each medical department, (4) provide for the rotation of resident staff between the two divisions, (5) maintain a consolidated administrative staffing policy to administer all operating facilities, (6) administer all duplicated services in a unitary fashion by a single individual, under a single budget, with a unitary supply and equipment procurement procedure, (7) maintain a centralized purchasing department charged with procuring equipment for both facilities, and (8) conduct operational reviews and evaluation procedures on a unitary basis treating the two divisions as a single entity.[155] In addition, WMC is required to retain all informational and financial records developed in implementing the unitary procedures for review by OCR upon request.[156]

Second, the contract requires that prior to implementing any plans to materially *add to* or *expand* the Southwest Division, WMC must submit such plans to HEW for

---

154. Ad.Rec. Ex. M–10 at M–27.

155. Contract at 10–12, pars. 7(a)–(n).

156. *Id.* at 12, par. 7(n).

an appropriate compliance review.[157] HEW may then approve or disapprove the proposed expansion "in a manner consistent with Title VI . . . and Section 504 . . . and the regulations issued pursuant thereto."[158] Similarly, before WMC may cause any material *reduction* in the services offered at the Delaware Division, HEW must first sanction the reduction as being consistent with its regulations and the statutes in question.[159]

Finally, the contract obligates WMC to allocate 2.8 million dollars to be used solely for the payment of costs incurred in the renovation of the Delaware Division.[160] These renovations, moreover, must be completed *"regardless of cost* within three years of the date on which construction of the Southwest Division is completed."[161]

The plaintiffs argue that the Secretary's decision to approve the unitary operations provision (a suggestion initially made by plaintiffs' counsel) and the renovations provision is not rationally supported by the evidence of record. First, they assert that instead of ensuring the continued viability of the Delaware Division, the unitary operations assurance will merely enable WMC to hide the deteriorating conditions which will gradually develop there. They suggest, for instance, that combined capital and operating budgets will permit the allocation of primary resources to the Southwest Division and that unitary operational reviews and evaluational procedures will permit WMC to conceal the deteriorating conditions and declining quality of health care available at the Delaware Division. These objections, however, fail to recognize that WMC is also required to submit to OCR separate records with respect to the equipment, staff and medical reporting of each division.[162] The submission of independent, as well as unitary, reports and evaluational reviews will permit OCR to monitor closely WMC operations on a system-wide basis and to compare components of the system in relation to each other. Detection of an imbalance in the allocation of financial or physical resources or in staffing patterns would prompt appropriate corrective measures. These conditions amply protect against the plaintiffs' charge that the unitary operations assurance will enable WMC to allocate resources unequally between the two divisions. The Court therefore cannot find the Secretary's decision in this regard to have been arbitrary or capricious.

Next, the plaintiffs attack the rationality of the renovation assurance on the ground that the 2.8 million dollar "renovation fund" is wholly inadequate to maintain the Delaware Division as a reasonably functional and efficient hospital facility. They assert, for instance, that the fund approved by the Secretary will barely cover the cost

---

157. Contract par. 10(a). A "material addition" is defined as any addition which WMC must submit to the Delaware Health Council, Inc. for approval and any addition which would independently or cumulatively increase the service capacity of any Southwest Division service by more than 5% of its service capacity as determined at the date of completion of the implementation of Plan Omega. *Id.* par 10(b).

158. *Id.* par. 10(a).

159. *Id.* par. 11(a). This provision defines "material reduction" as a reduction which will either independently or cumulatively reduce the service capacity of any Delaware Division service by more than 5% of its service capacity measured at the final date of completion of the implementation of Plan Omega. *Id.* par. 11(b).

160. Contract at 15–16, par. 12. Specifically, WMC is required to exert its best efforts to cause any trust agreement entered into by the Delaware Health Facilities Authority in connection with the financing of Plan Omega to require the trustees thereunder to place the 2.8 million dollars in a separate account, "the principal of which is to be expended only in payment of costs incurred in the renovation of the Delaware Division to the end that such renovation shall remain financially feasible and shall be effected." Alternatively, WMC may "create out of WMC funds an escrow fund" in the requisite amount to be spent solely on the renovation project. *Id.* pars. 12(a) and (b).

161. *Id.* par. 12(d) (emphasis added). The contract further provides that a failure to complete the renovation within the three-year period "shall be deemed to be a violation of Title VI of the Civil Rights Act of 1964." *Id.*

162. *See* Contract par. 7(n), Ex. B; Docket Item 20C, Ex. S–12.

of bringing the Delaware Division into compliance with numerous building codes and life safety standards set by the federal government, the state, and the Joint Commission on Accreditation of Hospitals; the contract thus fails to make certain, say the plaintiffs, that WMC will allocate sufficient funds to effect other improvements necessary to secure the Delaware Division's position vis-a-vis the Southwest Division.

The short answer to this assertion, however, is that the renovations provision does not purport to limit the scope of WMC's responsibility to improve the efficiency and quality of care at the Delaware Division; it merely requires that a specific sum of money be assigned at the outset for the purpose of effecting the renovations which WMC had proposed in connection with Plan Omega.[163] More importantly, however, the renovation assurance explicitly requires WMC to improve and modernize the Delaware Division *regardless of the costs* which may be involved.[164] The question of the sufficiency *vel non* of the 2.8 million dollar renovations fund is therefore irrelevant. Consequently, the plaintiffs' challenge to the renovations assurance is without merit and the Secretary's judgment will be sustained.

The Secretary was confronted early in his investigation with the issue of what impact the relocation of hospital services to the suburban location will have on the character of WMC's existing urban facility. Although there was evidence on both sides of the issue, he evidently concluded that even the *claim* that Plan Omega will mean the

eventual demise of the Delaware Division is sufficient to warrant countervailing assurances. The Secretary thus chose three measures which are designed not only to insure the continued viability of the Delaware Division, but to encourage the development and operation of an integrated, symmetrical hospital system in which the Delaware and Southwest Divisions will function as "paired" or complementary service units. Since the measures he selected are rationally supported by the administrative record, a court should not substitute its judgment in the absence of a patent abuse of discretion. *See Moog Industries, Inc. v. FTC,* 355 U.S. 411, 413–14 (1958); 4 K. Davis, *Administrative Law Treatise* § 30.01 (1958). Accordingly, the Court finds that it was neither arbitrary nor capricious for the Secretary to approve the assurances which obligate WMC to (1) operate the two divisions on a unitary basis, (2) allocate funds to be used solely for renovations to the Delaware Division, and (3) submit to HEW for approval all proposals to materially reduce services at the Delaware Division or to materially expand services at the Southwest Division.

#### 4. *Impact Upon Employees.*

Of primary concern to the Secretary in the area of employment was whether or not Plan Omega will result in the segregation of WMC employees by race, with the inner city facility being staffed predominantly by minorities and the Southwest location being staffed by whites.[165] In this regard, OCR

---

**163.** For a detailed list of each item WMC proposes to renovate at the Delaware Division under Plan Omega, see Exhibit B–1 to WMC's Supplemental Section 1122 Application, Docket Item 185, Ex. S3–1.

**164.** Also, the record indicates that the Secretary was aware of the fact that specific renovation projects had been effected at the Delaware Division before the contract of assurances was executed. These and other proposed renovations were to be financed from funds available under WMC's Annual Construction Project Forecast. Moreover, WMC has averred that monies in excess of the 2.8 million dollars set aside under the contract for additional renovations will be obtained from unrestricted investment funds, *see* Docket Item 185 at 11–12 and

Ex. S3–1, and there is no evidence of record which would discredit that averment.

**165.** The record includes a report, apparently prepared by the Wilmington Division of Community Affairs, which shows that in 1975 approximately 70 percent of WMC's employees lived in Wilmington or to the north of the city and, hence, closer to the present urban location than to the proposed Southwest location. Moreover, about two-thirds of WMC's unskilled and para-professional employees in the lower wage brackets, *i. e.,* earning less than $8,000 per year, reside in or near the city. The report concluded by suggesting that the "present effective relationship between the [urban] labor market and the [Wilmington] Medi-

evaluated information supplied by WMC concerning staffing patterns at the three present urban locations and the staffing assignments anticipated under Plan Omega. OCR concluded, however, that:

"[I]t would be unrealistic for [OCR] or the hospital to attempt to project staff assignments of individual employees since the hospital completion date is several years away. Any projections attempted would not be reliable since the racial composition of the present staff could change during the time of the projections and the actual assignment of employees." [166]

While an evaluation of Plan Omega's impact upon the assignment of employees was not practical, the Secretary nevertheless demanded assurances from WMC, prior to the actual implementation of an employee assignment procedure, that racial isolation of employees will not occur under Plan Omega.[167] Accordingly, the contract includes a provision which obligates WMC to recognize the need for employment opportunities for minority groups, especially urban minority groups, in its employment practices under Plan Omega and "for such purposes [to] continue to the extent practicable the employment policies" which it presently follows.[168] Also, WMC is required to maintain, for OCR's review, records showing the race and zip code of employees assigned to the two divisions once Plan Omega is implemented.[169] Finally, as previously noted, WMC is obligated to provide adequate transportation for employees assigned to either division who are without reliable transportation of their own.[170]

The Secretary concluded that these assurances will effectively neutralize the development of racial identifiability at the two facilities as a consequence of either employee transportation problems or invidious employment and staff assignment policies. Nevertheless, the plaintiffs suggest that a sizable proportion of WMC's urban minority employees will choose to work at the Delaware Division rather than be forced to take the shuttle to work at the Stanton location. As a result, they say that the urban facility will be predominantly staffed by minority employees while the Stanton Division will be staffed by whites.

The Secretary, however, found no evidence that would even tend to corroborate plaintiffs' contention; nor have the plaintiffs themselves been able to explain satisfactorily why their hypothesis assumes that only minority employees will elect to work at the urban facility and thereby avoid the shuttle to the Stanton Division. But even assuming the validity of this unsupported assertion, the employee records kept by WMC will enable OCR to quickly detect the development of a racial imbalance in the staffing or hiring practices at either division and to direct WMC to make necessary changes in its employment policies or assignment process to reverse the imbalance. If, as the plaintiffs suggest, a greater percentage of minority employees elect to work at the Delaware Division, then presumably OCR will demand that WMC assign a greater number of minority workers to the Southwest Division or increase the aggregate number of employment positions for minorities available at the Southwest Division.

The assurances approved by the Secretary appear reasonably calculated to ad-

cal Center will deteriorate if the place of actual work is moved [to the Southwest location]." Ad.Rec. Ex. C–49 at C–751, 757. It is arguable, however, that the hospital-provided transportation system will effectively offset the relative inaccessibility of the proposed Southwest location and, therefore, preserve employment opportunities for the city's labor force.

166. Investigative Report at 124–25.

167. *Id.* at 125.

168. Contract at 16, par. 13.

169. *Id.* at 13, par. 9 & Ex. B.

170. *Id.* at 2, par. 1(b). The transportation assurance also obligates WMC to expand the hours of its shuttle system in order to accommodate those of its employees whose shifts begin or end during the late evening or early morning hours. *Id.* The plaintiffs' repeated contention that the contract fails to provide transportation for employees on weekends and during evening hours is thus plainly refuted by its terms.

dress the plaintiffs' claim that the two facilities envisioned by Plan Omega will have a racially segregated staff. Thus, the Court cannot and should not attempt to substitute its judgment for that of the Secretary, especially when the record is devoid of any evidence that could be construed to contradict his judgment or that indicates his failure to consider the relevant factors.

▮ The plaintiffs, as an obvious afterthought, urge the Court to enter an order which obligates WMC to "abide by its commitments" in the contract of assurances. Such an order, the plaintiffs argue, would enable them to invoke the authority of this Court, presumably in the form of its contempt powers, for any material breach of the terms of the contract. There are basically two reasons, the plaintiffs contend, which should prompt the Court to lend its imprimatur to the contract of assurances. They allege, first, that HEW will be unable or unwilling to enforce the terms of its contract with WMC, and second, that HEW's only sanction for its breach is the termination of federal assistance, a result that would benefit neither the minority nor the majority users of WMC's health care resources.

In the Court's view, however, an order such as the plaintiffs have requested is unnecessary because an adequate equitable remedy already exists to safeguard the interests which they represent. So long as WMC accepts federal funds and continues as a health care facility, it must abide by the contract of assurances. If WMC fails or refuses to perform faithfully its obligations under the contract, the government clearly has the authority to bring an action for specific performance.[171] And if the government fails to fulfill its duty to enforce the contractual assurances by appropriate action of its own, the plaintiffs are entitled to bring an action to compel the government to carry out its duty in this regard. *See Adams v. Richardson,* 156 U.S. D.C. 267, 480 F.2d 1159 (1973) (en banc). Furthermore, it seems clear that the plaintiffs, and the class they represent, are third party beneficiaries of the contract between the government and WMC and are entitled to enforce the terms of that contract. *Lau v. Nichols,* 414 U.S. 563, 568–69, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Bossier Parish School Board v. Lemon,* 370 F.2d 847, 850–51 (C.A. 5), *cert. denied,* 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967); *Dillon v. Afbic Development Corp.,* 420 F.Supp. 572, 581 (S.D.Ala.1976).[172] Thus, the plaintiffs could also secure enforcement of the contract by proceeding directly against WMC for appropriate injunctive relief.[173] *See*

---

**171.** *See* 45 C.F.R. § 80.8(a)(1) & (2); Docket Item 231 at 91–92. The plaintiffs' assertion that HEW's only remedy for breach of the contract is to cut off federal funds is plainly false. The regulations contemplate reference to the Department of Justice for appropriate action—including a proceeding for specific performance. This obviously comports with the Congressional desire to end discrimination, rather than to end federal assistance. *See e. g.,* 110 Cong.Rec. 13130 (remarks of Senator Ribicoff).

**172.** Performance of the assurances in the contract is intended to and will directly benefit the minority and handicapped persons represented by the plaintiffs. Thus, those persons are third party beneficiaries of the contract and may sue for specific performance of it, even though they are not named in the contract. *See* Restatement of Contracts 2d § 138; 4 Corbin on *Contracts* §§ 810–25 (1951).

For analogous holdings, *see Miree v. United States,* 538 F.2d 643 (C.A. 5, 1976) (en banc)

(survivors of aircraft passengers killed in crash suing as third party beneficiaries of contract between county and FAA), *rev'd on other grounds,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Weinberger v. New York Stock Exchange,* 355 F.Supp. 139, 144 (S.D.N.Y.1971) (investor suing as third party beneficiary of agreement between SEC and New York Stock Exchange); *United States ex rel. Johnson v. Morley Const. Co.,* 98 F.2d 781, 788–89 (C.A. 2, 1938) (laborers suing as third party beneficiaries of government contract).

**173.** The Court expresses no opinion as to whether federal common law or state law would govern an action brought by the plaintiffs as third party beneficiaries directly against WMC for specific performance of the contract of assurances. *See Miree v. DeKalb County, Georgia,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977) (suit by survivors of air crash victims as third party beneficiaries of contract between county and FAA is governed by state

*Dillon v. Afbic Development Corp., supra,* 420 F.Supp. at 581. Because these remedies provide adequate means to ensure that WMC will keep its promises, the Court declines the invitation to enter an order directing WMC to abide by the terms of the contract of assurances.

## IV. CONCLUSION

The hard-fought legal battle generated by Plan Omega illustrates the type of conflict (at times emotional) that can arise over the grant or denial of federal financial assistance to a public or private activity to which Title VI and Section 504 apply. The ensuing struggle has served to heighten awareness of the tension that exists between the pragmatic interest of a privately-owned hospital and the societal interest in safeguarding the civil rights of discrete and insular minorities who are affected by the decisions of such a hospital.

Although the plaintiffs have consistently maintained that a federal court is the only proper arbiter of that tension, Congress explicitly provided that the collective social interests identified in Title VI and Section 504 shall be secured in the first instance by the federal departments or agencies empowered to extend federal financial assistance to the multitude of programs to which those laws apply. In accordance with the discretion delegated to him by Congress, the Secretary found a violation and through voluntary compliance selected a remedy, embodied in the contract of assurances, which is designed to secure Plan Omega's compliance with the statutes in question. The contractual obligations imposed upon WMC with respect to Plan Omega cannot be taken lightly. The contract of assurances, as this Court has previously noted, is a hard bargain (a bargain that WMC may one day come to regret), which is purposely drafted in open-ended, normative language intended to ensure that WMC fulfills its affirmative duty to eliminate Plan Omega's potential disproportionate impact upon urban minorities. Whether the modifications

to Plan Omega required by the contract of assurances represent a perfect solution to the tension between the practical interests of a private hospital and the rights guaranteed under Title VI and Section 504 is not for this Court to decide. The Secretary has fully performed the duties and responsibilities imposed upon him by law. Having carefully measured his action by the appropriate standard of review, the Court concludes that the Secretary's determination, particularly his decision to approve the contract of assurances as an adequate remedy to secure Plan Omega's compliance with Title VI and Section 504, is rationally supported by the evidence of record. The claim that Plan Omega as modified will violate those laws finds no support in the record. Therefore, the Secretary's decision will be affirmed and final judgment will be entered in his favor on this issue. Furthermore, since the Court will affirm the Secretary's finding that a modified Plan Omega will comply with Title VI and Section 504, final judgment also will be entered in WMC's favor on that issue.

The Court will enter an order in accordance with this Opinion.

**The WILMINGTON MEDICAL CENTER, INC., et al., Defendants.**

law). *See generally* Mishkin, *The Variousness of "Federal Law": Competence and Discretion* in the *Choice of National and States Rules for Decision,* 105 U.Pa.L.Rev. 797 (1957).